**Reversed and Rendered in Part, Affirmed in Part, and Opinion filed March 27, 2014.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-12-00246-CV

---

## HUNTER BUILDINGS & MANUFACTURING, L.P., HUNTER BUILDINGS, L.L.C., HUNTER BUILDINGS INTERNATIONAL, L.L.C., BBG GROUP, L.L.C., MILO NICKEL, AND THOMAS MICHAEL LEBLANC, Appellants

### V.

## MBI GLOBAL, L.L.C., Appellee

---

**On Appeal from the 215th District Court
Harris County, Texas
Trial Court Cause No. 2008-50193**

---

## O P I N I O N

The primary issue in this case is the sufficiency of the evidence to support a finding that the corporate appellants' misappropriation of trade secrets proximately caused appellee/plaintiff to sustain lost-profits damages in the past. The plaintiff company sued two of its former officers and various enterprises related to the

officers' current employment. The jury made liability and damage findings as to claims for breach of fiduciary duty and misappropriation of trade secrets. But, the jury found that each former officer's percentage of responsibility was zero. Though the appellants moved the trial court to disregard all jury findings adverse to them, the plaintiff sought judgment on the jury's verdict. The trial court rendered a money judgment on the verdict, holding the former officers and the enterprises jointly and severally liable for lost profits, the only damages the jury found. On appeal, we conclude that the only damage finding upon which a money judgment may be based is a finding of lost-profits damages proximately caused by the corporate appellants' misappropriation of the plaintiff's trade secrets. Because we conclude that the evidence is legally insufficient to support a causation finding, we reverse the trial court's judgment and render judgment that the plaintiff take nothing against the appellants.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In the late 1990s, Mark Massey and Sam Lavergne worked at the same company with Fred Gossen. In 1999, after that company ceased operating, Gossen formed MB Industries, L.L.C. (hereinafter, "Industries"), and Massey and Lavergne formed appellant/defendant Hunter Buildings & Manufacturing, L.P. (hereinafter, "Hunter Buildings"), whose general partner is appellant/defendant Hunter Buildings, L.L.C. ("Hunter L.L.C."). Both Industries and Hunter Buildings manufactured and sold blast-resistant buildings.

Appellant/defendant Milo Nickel, a lawyer, started working for Industries in 2006. Appellant/defendant Michael LeBlanc started working for Industries in 2007. The following year, in April 2008, appellee/plaintiff MBI Global, L.L.C. (hereinafter, "Global") was formed as a sister company of Industries. Nickel was

2

the first President of Global and a director of Global's parent company. Leblanc worked as the Vice President of the newly formed Global. LeBlanc helped establish Global's organizational structure, assisted in the hiring of important personnel, and worked closely with Nickel to direct the company's marketing and manufacturing operations. Nickel and LeBlanc each signed a "Non-Competition and Trade Secrets Agreement" at the beginning of their employment with Industries.

LeBlanc resigned from his position at Global on July 26, 2009. A few weeks later, on August 20, 2009, Nickel resigned from his position as President of Global. Nonetheless, Nickel was still a director of Global's parent company, and he continued to work for Global as a consultant, assisting in the obtaining of a $7 million contract.[1] On July 30, 2009, appellant/defendant BBG Group, L.L.C. (hereinafter, "BBG Group"), was formed with Nickel and LeBlanc as the two members, each owning a fifty-percent interest. Two days later, on August 1, 2009, BBG Group and Hunter Buildings entered into a Joint Venture Agreement regarding the operation of a limited liability company to be formed in the future. That company, appellant/defendant Hunter Buildings International, L.L.C. (hereinafter, "Hunter International") was formed on September 17, 2009, with Hunter Buildings and BBG Group as the two members, each owning a fifty-percent interest.

Thus, Nickel and LeBlanc formed BBG Group, and through Hunter International, BBG Group went into business with Hunter Buildings to compete against Global. Nickel and LeBlanc did not tell Global that they were leaving to compete against Global, and they did not tell Global or Gossen about the formation

_____

[1] This project was booked to Industries rather than Global, and Global testified that it was considered an Industries project rather than a Global project.

3

of BBG Group or Hunter International. Even after Nickel resigned his position as President of Global, he continued working for Global for some time on a consulting basis. During this time period, Nickel participated in conversations with people at Global regarding Global's business projects. Global asserts that Nickel passed this information on to LeBlanc and the Hunter entities. Global alleges, and we presume for the sake of argument, that all of the following were Global's trade secrets: (1) Global's blast-resistant building drawings, testing data, and FEBR[2] certification information, (2) Global's use of ballistic plate in its building design and information regarding "A/C brackets," (3) Global's business proposals, including cost-and-pricing information, and (4) Global's customer lists and information regarding future developments and markets, including customer contacts and relationships (hereinafter, collectively, the "Trade Secrets"). Global alleged that Nickel, LeBlanc, BBG Group, Hunter International, Hunter L.L.C., and Hunter Buildings (the foregoing companies sometimes collectively referred to hereinafter as the "Corporate Defendants") misappropriated the Trade Secrets.

The record reflects that there is a history of "bad blood" between Gossen and Massey. In August 2008, several Hunter entities filed suit in the case under review against Industries, Gossen, and Massey's ex-wife. In March 2010, Global intervened, and Global and Industries asserted claims regarding the departure of Nickel and LeBlanc. Eventually, the Hunter entities nonsuited their claims for relief. By the time the case proceeded to a jury trial, Global was realigned as the only plaintiff asserting various claims against Nickel, LeBlanc, Massey, Lavergne, the Corporate Defendants, and Hunter Leasing, L.P. In a partial summary-judgment order, the trial court ruled that the non-competition provisions of the

---

[2] "FEBR" is an industry acronym for "Forced Entry Ballistic Resistant." Building designs may be "FEBR certified," and thus approved by the United States Department of State for construction and use overseas.

4

agreements Nickel and LeBlanc signed when they started working at Industries are invalid and unenforceable. The trial court did not set aside this ruling, and no party has challenged this ruling on appeal.

After a fourteen-day trial, the case was submitted to the jury. In response to the questions in the charge, the jury found in pertinent part, as follows: (1) Nickel and LeBlanc each failed to comply with the fiduciary duty he owed to Global; (2) the Corporate Defendants knowingly participated in the breaches of fiduciary duty by Nickel and by LeBlanc; (3) Nickel, LeBlanc, and each of the Corporate Defendants misappropriated Global's trade secrets; (4) $4.4 million in past-lost-profits damages, if paid now in cash, would fairly and reasonably compensate Global for its damages, if any, that were proximately caused by the conduct found by the jury to be either a breach of fiduciary duty or misappropriation of Global's trade secrets;[3] (5) a preponderance of the evidence did not prove that any of the defendants were part of a conspiracy regarding the breach of fiduciary duty by either Nickel or LeBlanc or regarding the misappropriation of Global's trade secrets; (6) the percentage of responsibility attributable to Nickel is zero percent; and (7) the percentage of responsibility attributable to LeBlanc is zero percent.[4]

After trial, Global did not challenge any jury finding and sought judgment on the verdict. Global argued that Nickel and LeBlanc each should be jointly and severally liable with the Corporate Defendants, despite the jury's finding that each had a percentage of responsibility of zero. Nickel, LeBlanc, and the Corporate

---

[3] This was the only finding by the jury of any damages. The jury answered "0" to questions regarding profits made by Nickel and LeBlanc, Global's loss of good will, and Global's future lost profits. Global did not challenge these adverse findings in the trial court, and Global has not appealed the trial court's judgment. Thus, the only damages at issue in this appeal are Global's past lost-profits damages, if any.

[4] The jury fixed the following percentages of responsibility for the Corporate Defendants: 17% for Hunter Buildings, 16% for Hunter, L.L.C., 34% for Hunter International, and 33% for BBG Group.

5

Defendants moved the trial court to disregard all jury findings adverse to them. The trial court rendered judgment that Global recover $4.4 million, plus prejudgment and postjudgment interest, against Nickel, LeBlanc, and the Corporate Defendants, jointly and severally.

## II. ISSUES AND ANALYSIS

Hunter International, Hunter L.L.C., and Hunter Buildings (hereinafter sometimes collectively, the "Hunter Companies") have filed one brief, in which they assert six appellate issues. Nickel, LeBlanc, and BBG Group have filed their own brief, in which they assert three appellate issues. In each brief, the appellants filing the brief adopt by reference the other appellants' brief, as allowed by the Texas Rules of Appellate Procedure.[5] *See* Tex. R. App. P. 9.7 (stating that "[a]ny party may join in or adopt by reference all or any part of a brief . . . filed in an appellate court by another party in the same case"). We address each of the arguments necessary for the final disposition of this appeal. *See* Tex. R. App. P. 47.1.

### A. Did the trial court err in impliedly disregarding the jury's findings that Nickel and LeBlanc each had a percentage of responsibility of zero?

By rendering judgment against Nickel and LeBlanc jointly and severally with the Corporate Defendants, the trial court impliedly disregarded the jury's findings in response to Question 12 that Nickel and LeBlanc each had a percentage of responsibility of zero regarding his causing or contributing to cause the harm to Global.[6] No party moved the trial court to disregard the jury's response to

---

[5] Nickel, LeBlanc, and BBG Group adopted by reference the Hunter Companies' brief in its entirety. The Hunter Companies adopt by reference all issues and arguments in the other appellants' brief to the extent these issues and arguments also apply to the Hunter Companies.

[6] Though Global sought equitable relief in the trial court, the trial court did not award any equitable relief in its judgment, and Global has not appealed the trial court's judgment. Thus,

6

Question 12; therefore, the trial court erred in disregarding the zero-responsibility findings unless these findings were immaterial. *See Hall v. Hubco, Inc.*, 292 S.W.3d 22, 34 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *Fire Ins. Exch. v. Sullivan*, 192 S.W.3d 99, 105 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). A jury question is immaterial when it should not have been submitted, or when it was properly submitted but has been rendered immaterial by other findings. *See Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). A jury question is immaterial when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict. *See City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995). A question which calls for a finding beyond the province of the jury, such as a question of law, may be deemed immaterial. *See Spencer*, 876 S.W.2d at 157.

Nickel and LeBlanc argue on appeal that the trial court erred in rendering judgment against them because of the jury's material findings that Nickel and LeBlanc each had a percentage of responsibility of zero. The Corporate Defendants assert that they may not be held liable for breach of fiduciary duty because, under the knowing-participation findings, the Corporate Defendants are liable only to the extent that Nickel and LeBlanc have liability for breach of fiduciary duty and Nickel and LeBlanc have no such liability based on the jury's zero-responsibility findings.[7] The Corporate Defendants, Nickel, and LeBlanc (the foregoing parties sometimes collectively referred to hereinafter as the "Defendants") note that the jury failed to find any civil conspiracy.

Question 12 does not call for a finding beyond the province of the jury, such

there is no issue in this appeal as to any equitable remedies.

[7] The Hunter Companies make this assertion through their adoption by reference of all issues and arguments in the other appellants' brief to the extent these issues and arguments also apply to the Hunter Companies.

as a question of law. *See Spencer*, 876 S.W.2d at 157. This court has concluded that Chapter 33 of the Texas Civil Practice and Remedies Code, entitled "Proportionate Responsibility," applies to claims for misappropriation of trade secrets, so the trial court properly submitted Question 12 to the jury. *See* Tex. Civ. Prac. & Rem. Code § 33.003 (West 2014); *Bishop v. Miller*, 412 S.W.3d 758, 780–81 (Tex. App.—Houston [14th Dist.] 2013, no pet.). We conclude that Question 12 is not immaterial on the basis that it should not have been submitted.[8] *See Fire Ins. Exch.*, 192 S.W.3d at 105–06.

The jury found that Nickel and LeBlanc failed to comply with their respective fiduciary duty to Global and that the Corporate Defendants knowingly participated in these breaches of fiduciary duty. Global argues that these findings made the Defendants jointly and severally liable for the damages found by the jury, regardless of whether these damages are based on breach of fiduciary duty or on the Corporate Defendants' misappropriation of trade secrets. According to Global, the common-law joint and several liability resulting from these findings makes the zero-responsibility findings immaterial. Under Global's argument, the effect of the knowing-participation findings would be similar to the effect of a conspiracy finding. *See Energy Maintenance Services Group I v. Sandt*, 401 S.W.3d 204, 220 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (stating that each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy and that a finding of civil conspiracy imposes joint and several liability on all conspirators for actual damages resulting from acts in furtherance of the conspiracy).

---

[8] When the jury charge was submitted, the trial court did not know whether the jury would make the breach-of-fiduciary-duty and knowing-participation findings that, according to Global, trigger the Defendants' joint and several liability for the damages found by the jury.

8

Texas courts have indicated that, under Texas common law, if a third party knowingly participates in a defendant's breach of a fiduciary duty owed to a plaintiff, the third party is jointly liable with the defendant for damages to the plaintiff proximately caused by this breach of fiduciary duty, and the plaintiff has the same equitable remedies against the defendant and the third party based upon this breach. *See Kinzbach v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512–14 (Tex. 1942); *Kline v. O'Quinn*, 874 S.W.2d 776, 786–87 (Tex. App.—Houston [14th Dist.] 1994, writ denied). The parties have not cited, and research has not revealed, any Texas case in which the court addresses (1) the distinction between civil conspiracy and knowing participation in a breach of fiduciary duty, or (2) the issue of whether a knowing-participation finding, by itself, makes the party breaching his fiduciary duty liable for damages caused by the party who knowingly participated in the breach of fiduciary duty.[9] *See Halberstam v. Welch*, 705 F.2d 472, 477–78 (D.C. Cir. 1983) (addressing, under District of Columbia law, the distinction between civil conspiracy and aiding and abetting, which is similar to knowing participation, and concluding that an aider or abettor is liable for damages caused by the main perpetrator, but absent a finding of conspiracy, the main perpetrator is not liable for damages caused by the aider or abettor). For the reasons discussed below, presuming for the sake of argument that the jury's breach-of-fiduciary-duty findings and its knowing-participation findings make the

---

[9] Global cites the Supreme Court of Texas's opinion in *ERI Consulting Engineers, Inc. v. Swinnea*. *See* 318 S.W.3d 867, 881–82 (Tex. 2010). In that case, after a bench trial, the trial court found that a civil conspiracy existed between Swinnea and Brady Environmental. *See id.* at 872, 881. The trial court apparently also found that Brady Environmental knowingly participated in Swinnea's breach of fiduciary duty. *See id.* at 881. But, the high court did not discuss any legal principles regarding knowing participation in a breach of fiduciary duty or the distinction between that doctrine and civil conspiracy. *See id.* at 881–82. Instead, the *Swinnea* court addressed whether Brady Environmental was subject to liability for actual damages, punitive damages, and equitable forfeiture of contractual consideration based upon Brady Environmental's conspiracy with Swinnea. *See id.*

9

Defendants jointly and severally liable the damages found by the jury, including the damages based on the Corporate Defendants' misappropriation of trade secrets, the zero-responsibility findings are not immaterial.

In response to Questions 1 and 2, the jury found that Nickel and LeBlanc failed to comply with their respective fiduciary duty to Global. Neither question required the jury to find that the failure to comply with the respective fiduciary duty caused any injury or damages to Global. In response to Questions 8 and 9, the jury found that the Corporate Defendants knowingly participated in the breaches of fiduciary duty by Nickel and by LeBlanc. No question in the charge asked the jury to determine whether this knowing participation caused any damages to Global. In answer to Question 7, the jury found that $4.4 million in damages for past lost profits would fairly and reasonably compensate Global for its damages that were proximately caused either by the breaches of fiduciary duty found in response to Questions 1 or 2 or by the misappropriation of trade secrets found in response to Questions 4 or 5. In answering Question 7, the jury did not have to find that the damages were proximately caused by the failure of Nickel or LeBlanc to comply with their respective fiduciary duty to Global. In response to Question 12, the jury found that Nickel and LeBlanc each had a percentage of responsibility of zero regarding the causing or contributing to cause the harm to Global. As part of this finding, the jury necessarily found that the breaches of fiduciary duty by Nickel and LeBlanc did not cause or contribute to the lost-profits damages found by the jury in response to Question 7. Thus, the lost-profits damages found in response to Question 7 (the only damages found by the jury) were not based upon the conduct found in response to Question 1 (breach of fiduciary duty by Nickel), Question 2 (breach of fiduciary duty by LeBlanc), or Question 4 (misappropriation of trade secrets by Nickel and LeBlanc), and the only conduct that the jury found caused

10

the damages in question was the misappropriation of trade secrets by the Corporate Defendants found in response to Question 5.

Presuming, without deciding, that the jury's breach-of-fiduciary-duty findings and its knowing-participation findings make the Defendants jointly and severally liable for the damages found by the jury and for the breaches of fiduciary duty by Nickel and LeBlanc, the zero-responsibility findings still show that the only damage finding upon which a money judgment may be based is a finding of past-lost-profits damages proximately caused by the Corporate Defendants' misappropriation of Global's trade secrets. Thus, even under this presumption, the zero-responsibility findings altered the effect of the verdict, cannot be found elsewhere in the verdict, and were not rendered immaterial by any other jury finding.[10] *See City of Brownsville*, 897 S.W.2d at 752; *Fire Ins. Exch.*, 192 S.W.3d at 105–06.

The question regarding the percentage of responsibility attributable to Nickel and LeBlanc should have been submitted and was not rendered immaterial by other jury findings. We conclude that this question and the jury's zero-responsibility findings were material, and that the trial court erred by impliedly disregarding these findings in rendering its judgment. *See Fire Ins. Exch.*, 192 S.W.3d at 105–06.

---

[10] If, as the Defendants assert, the knowing-participation findings only resulted in the Corporate Defendants having the same liability as Nickel and LeBlanc based upon the individuals' breaches of fiduciary duty and if these findings did not make Nickel and LeBlanc liable for the Corporate Defendants' misappropriation of trade secrets, then Nickel and LeBlanc would have no possible liability for money damages under the jury's findings, and the jury's finding in response to Question 7 would be the only basis for a money judgment against the Corporate Defendants.

**B.** **Is the evidence legally sufficient to support a finding that the Corporate Defendants' misappropriation of Global's trade secrets proximately caused Global to sustain lost profits in the past?**

In light of the zero-responsibility findings, the jury's damage finding was that $4.4 million, if paid then in cash, would fairly and reasonably compensate Global for its damages, if any, that were proximately caused[11] by the Corporate Defendants' conduct in misappropriating Global's trade secrets. We presume, without deciding, that the Trade Secrets were trade secrets and that the Corporate Defendants misappropriated Global's trade secrets. We now address whether the trial evidence is legally sufficient to support a finding that the Corporate Defendants' misappropriation of trade secrets proximately caused Global to sustain lost-profits damages in the past.[12]

Recovery for lost profits does not require that the loss be susceptible of exact calculation. *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex. 1992). The injured parties, however, must do more than show that they suffered some lost profits. *Id.* They must demonstrate the amount of the loss with reasonable certainty, by competent evidence. *Id.* What constitutes reasonably certain evidence of lost profits is a fact-intensive determination. *Id.* At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. *Id.* The bare

---

[11] In the jury charge, the trial court defined "proximate cause" to mean "a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom." The trial court instructed the jury that there may be more than one proximate cause of an event.

[12] On appeal, the Hunter Companies assert that the evidence is legally insufficient to support a finding that any alleged misappropriation of trade secrets caused damages to Global. Nickel, LeBlanc, and BBG Group have adopted by reference the Hunter Companies' brief in its entirety.

12

assertion that contracts were lost does not demonstrate a reasonably certain, objective determination of lost profits.[13] *Id*. at 85. To support the recovery of lost profits, the record must contain evidence sustaining one complete calculation of lost profits. *Id.* Lost profits are damages for the loss of net income to a business and, broadly speaking, reflect income from lost business activity, less expenses that would have been attributable to that activity. *Miga v. Jensen,* 96 S.W.3d 207, 213 (Tex. 2002). The calculation of lost-profits damages must be based on net profits, not gross revenue or gross profits.[14] *See Heine,* 835 S.W.2d at 83 n.l; *Kellman v. Workstation Integrations, Inc.*, 332 S.W.3d 679, 684 (Tex. App.— Houston [14th Dist.] 2010, no pet.).

To recover lost profits, the plaintiff must produce evidence from which the jury reasonably may infer that the lost-profits damages for which recovery is sought have resulted from the conduct of the defendant. *See Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 181 (Tex. 1995), *abrogated on other grounds by*, *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 45–46 (Tex. 2007); *Houston Mercantile Exch. Corp. v. Dailey Petroleum Corp*., 930 S.W.2d 242, 248 (Tex. App.—Houston [14th Dist.] 1996, no writ). This requirement is met when a jury is presented with pleading and proof that establish a direct causal link between the lost-profits damages, the actions of the defendant, and the injury suffered. *See Bowser Bouldin, Ltd.*, 896 S.W.2d at 181; *Houston Mercantile Exch. Corp.*, 930 S.W.2d at 248.

At trial, Global called two damages experts to testify. The first expert,

---

[13] The Defendants argue that the proof of lost profits was speculative and not reasonably certain because Global's business was new and unestablished. *See Texas Instruments, Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276, 279–90 (Tex. 1994). We do not address this argument.

[14] The Defendants also argue that the evidence of lost profits is legally insufficient because it was based on a calculation of gross profits, not net profits. We do not address this argument.

James Hill, testified regarding his expert opinion that, as of June 30, 2009, Global's goodwill was valued at $32 million. Hill did not testify regarding loss of goodwill or lost profits. He also stated that he was not testifying about causation or damages.

Global called a second damages expert, Jeffrey Spilker, who presented testimony regarding various matters, including the following:

- Spilker used a "before and after model," in which he made projections as to what would have happened "before the alleged acts occurred" and compared those projections to what actually happened.

- The point in time at which Spilker conducted this "before and after" analysis was the summer of 2009. Spilker used this time frame because he made a reasonable assumption that Nickel and LeBlanc left Global in the summer of 2009.

- In 2007, Nickel made an internal estimate that revenues for Global's business in 2008 would be $2,500,000. The actual 2008 revenues were $6.9 million.

- In 2008, Nickel made an internal forecast that revenues for Global would be $25 million in 2009.

- Spilker also considered an internal Global document from May 2009, in which close to $200 million in sales opportunities were identified ("2009 Pipeline Document"). After analyzing these opportunities and other information, Spilker concluded that "but for . . . the asserted events" Global's 2009 revenues for the market in question would have been in the $25 million range.[15]

- Spilker calculated Global's lost profits for 2009, 2010, and 2011. Spilker indicated that, but for the "asserted acts of the

---

[15] Spilker defined the relevant market as the market for contracts with governmental entities for FEBR buildings sold internationally and constructed overseas. At times during his testimony, Spilker referred to this market as the "market that was taken." It is not clear what Spilker meant by this phrase. He stated that his defined market "was taken by the asserted acts of the defendant[s]."

defendants" Global's gross sales revenue would have been $20 million in 2009, $25 million in 2010, and $25 million in 2011. The actual sales that Global had in the market in question were $3.6 million in 2009, zero in 2010, and zero in 2011.

- Spilker assumed that Global's sales decreased "because of the conduct of Mr. Nickel or Mr. Leblanc." He said he would let the evidence speak for itself on that matter.

- After subtracting out a percentage representing Global's "gross margin," Global's total lost profits for the years 2009, 2010, and 2011 were $26,554,000.

- When asked whether Global should have to show that it actually bid on the same contracts on which Hunter bid and that Global would have obtained them, Spilker stated that was not the process or methodology that he used. Spilker indicated it was not necessary for Global to prove specific contracts that were lost to prove lost profits.

- Out of sales opportunities of about $200 million in projects in the market in question listed on the 2009 Pipeline Document, Global submitted bids on projects that had a total value of only approximately $44 million.

- Hunter International did not win any of the projects listed on the 2009 Pipeline Document.

- Spilker could not tell the jury why Global won or did not win any of the projects listed on the 2009 Pipeline Document. He could not say whether the projects were lost because the company changed its mind, did something different, or because Nickel and LeBlanc had left Global. Spilker testified that it would be extremely difficult to tie the lost-profits calculation to specific contracts that were lost because there was "a disrupted market after the events," apparently a reference to the conduct alleged in Global's petition.

- One reason why Global's sales could have been less than anticipated would be if its prices were not competitive. Another reason may have been that Global made fewer bids after Nickel and LeBlanc left. Another reason could be because of poor management.

15

- Global was in disarray after Nickel and LeBlanc left and part of the disarray may have been that the Global employees following this departure had "attention span issues" regarding proposals for projects.

- Spilker was aware that Nickel and LeBlanc signed covenants not to compete, but he was not aware when he testified at trial that the trial court had ruled that these covenants are unenforceable.[16]

- Spilker stated repeatedly during his testimony that he was not opining on causation.

Spilker did not testify as to whether any defendant's misappropriation or use of Global's trade secrets caused Global any damage or any lost profits. Indeed, Spilker did not opine as to the lost profits caused by any conduct of any defendant. In fact, throughout his entire testimony Spilker never once uttered the term "trade secret" or "trade secrets." Spilker did not testify regarding any calculation of lost profits caused by any defendant's alleged misappropriation or use of Global's trade secrets. Spilker did indicate in his testimony that, but for the acts of the defendants alleged in Global's petition, Global's gross sales revenue would have been $20 million in 2009, $25 million in 2010, and $25 million in 2011.[17] But, as discussed below, this testimony does not address any lost revenue caused by the Defendants' alleged misappropriation of Global's trade secrets.

Significantly, the Defendants' allegedly actionable conduct, as set forth in Global's petition, included competing against Global, soliciting Global's

---

[16] Spilker also testified regarding an "unjust enrichment" value, which he stated was the benefits, in the form of revenues, that the defendant obtained from "the asserted acts." This unjust-enrichment testimony is based on alleged benefits received by the Defendants, rather than alleged damages suffered by Global. Thus, this testimony does not address lost-profits damages. The jury did not find any damages in response to the part of the jury charge to which the unjust-enrichment testimony corresponds.

[17] Spilker referred globally to all conduct of all defendants alleged in Global's petition.

customers, and soliciting Global's employees. Yet, as reflected in the jury charge, in a damages claim based on misappropriation of trade secrets, the plaintiff seeks to recover damages caused by the defendant's use of the trade secrets. *See Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 635–36 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Thus, if one or more of the Defendants competed aggressively with Global, or solicited Global's customers or employees, without using Global's trade secrets, then profits lost as a result of such conduct were not caused by the Defendants' misappropriation of Global's trade secrets. *See id.*; *Rusty's Weigh Scales and Service, Inc. v. North Texas Scales, Inc.*, 314 S.W.3d 105, 111 (Tex. App.—El Paso 2010, no pet.) (distinguishing between non-actionable price competition and actionable misappropriation of trade secrets). Thus, Spilker's opinion as to what Global's gross sales revenue would have been, but for the acts of the Defendants alleged in Global's petition, is based in part on acts that are not actionable under a claim for misappropriation of trade secrets. Spilker's opinion does not address what Global's gross sales revenue would have been, but for the Defendants' alleged misappropriation of Global's trade secrets. *See Rusty's Weigh Scales and Service, Inc.*, 314 S.W.3d at 111 (faulting plaintiff's proof of lost profits caused by misappropriation of trade secrets, because, among other things, evidence did not show that the alleged misappropriation of trade secrets, as opposed to other factors, including plaintiff's being outbid by the defendant, caused any lost business).

Spilker's calculation of Global's lost profits suffered from the same deficiency. Spilker testified regarding his calculation of Global's lost profits for the years 2009, 2010, and 2011 in a certain market. No written document describing Spilker's calculation of lost profits was admitted in evidence. Based on his trial testimony, it appears that, in calculating Global's lost profits, Spilker

17

presumed that the Defendants engaged in all of the actionable conduct alleged in Global's petition and then calculated lost profits as damages for this allegedly actionable conduct. Nonetheless, Spilker did not connect his calculation of lost profits to any defendant's alleged misappropriation of trade secrets. Spilker's testimony does not reflect that he attempted to measure the difference between Global's actual profits and the profits, if any, that Global would have made if Nickel and LeBlanc had left Global when they did, and the Defendants had competed against Global without any misappropriation of trade secrets.

Spilker testified that, when Nickel and LeBlanc were still working for Global, in June 2009, Global may have had more than four employees, but it would not "have been much more than that." There was evidence that Nickel and LeBlanc had been successful in obtaining projects for Global. If two proficient employees leave the employ of a company with a small number of other employees and start working for a competitor, the former employer may lose profits, even if the two employees do not misappropriate any of the former employer's trade secrets. Nonetheless, Spilker's calculation of lost profits does not take into account the extent to which the decrease in Global's sales might be based on such a change in personnel, or other factors, rather than the Defendants' alleged misappropriation of trade secrets. Spilker repeatedly stated that he was not opining on causation of damages.

There is a fundamental difficulty with Spilker' testimony. Though he repeatedly stated that he was not opining as to causation, he did indicate that, but for the acts of the Defendants alleged in Global's petition, Global's gross sales revenue in the market in question would have been $16.4 million higher in 2009, $25 million higher in 2010, and $25 million higher in 2011. But, at best, this testimony addresses lost gross revenue caused by all of the actionable conduct

alleged in Global's petition, and significant components of this alleged conduct do not constitute misappropriation of trade secrets. Spilker's calculation of lost profits was not tied in any way to the portion, if any, of the lost profits which may have been caused by the Defendants' alleged misappropriation of Global's trade secrets, but instead extended globally to all of the Defendants' allegedly actionable conduct. *See Houston Mercantile Exch. Corp.*, 930 S.W.2d at 248 (noting that expert's calculation of lost profits caused by alleged unfair competition improperly presumed that every jar sold was sold through unfair competition and was not tied to the jars sold through conduct actionable under the unfair-competition claim). Under the applicable standard of review and on this record, Spilker's testimony is legally insufficient to support a finding that the Corporate Defendants' misappropriation of trade secrets proximately caused Global to sustain lost-profits damages in the past. *See Bowser Bouldin, Ltd*., 896 S.W.2d at 181; *Houston Mercantile Exch. Corp.*, 930 S.W.2d at 248.

Spilker was the only expert who testified that Global suffered lost profits.[18] No other witness testified that the Defendants' misappropriation of trade secrets caused Global any lost profits.[19] After reviewing all of the trial evidence under the applicable standard of review, we conclude this evidence is legally insufficient to support a finding that the Corporate Defendants' misappropriation of trade secrets proximately caused Global to sustain lost-profits damages in the past.[20] *See*

---

[18] Daphne Berken, an expert retained by the Defendants, testified that, in her opinion, Global did not suffer any lost profits.

[19] Evidence that one of the Defendants received a benefit from the alleged misappropriation of Global's trade secrets is not evidence that this misappropriation proximately caused Global to sustain lost profits in the past.

[20] Even if the issue were whether the evidence is legally sufficient to support a finding that the *Defendants*' misappropriation of trade secrets proximately caused Global to sustain lost profits damages in the past, we would conclude the evidence is legally insufficient under a substantially similar analysis.

*Bowser Bouldin, Ltd.*, 896 S.W.2d at 181; *Houston Mercantile Exch. Corp.*, 930 S.W.2d at 248.[21]

## III. CONCLUSION

The jury question regarding the percentage of responsibility attributable to Nickel and LeBlanc and the jury's zero-responsibility findings were material, and therefore, the trial court erred by impliedly disregarding these findings in rendering its judgment. The lost-profits damages found by the jury were not based upon the conduct found in response to Question 1 (breach of fiduciary duty by Nickel), Question 2 (breach of fiduciary duty by LeBlanc), or Question 4 (misappropriation of trade secrets by Nickel and LeBlanc), and the only conduct that the jury found caused the damages in question was the misappropriation of trade secrets by the Corporate Defendants found in response to Question 5. But, the trial evidence is legally insufficient to support a finding that the Corporate Defendants' misappropriation of trade secrets proximately caused Global to sustain any lost-profits damages in the past.[22] Accordingly, we reverse the portions of the trial court's judgment in which the trial court granted relief in favor of Global and

---

[21] Global cites the Supreme Court of Texas's opinion in *ERI Consulting Engineers, Inc. v. Swinnea*. *See* 318 S.W.3d 867, 879–80 (Tex. 2010). In that case, the trial court awarded ERI lost profits from a single client and there was direct evidence that the client specifically indicated it would no longer be working with ERI because of Swinnea's involvement with one of that client's competitors. *See id.* The high court held that the evidence was legally sufficient to establish a causal link between Swinnea's actionable conduct and ERI's lost profits. *See id.* Significantly, the *Swinnea* court emphasized that Swinnea did not contest his liability for fraud, breach of contract, or breach of fiduciary duty. *See id.* at 872, 880, n.11. In addition, the trial court had held that Swinnea's involvement with the client's competitor was improper and legally actionable, so that Swinnea was liable for any damage caused by his involvement with the competitor. *See id.* at 880, n.11. In the case under review, Global does not seek to recover lost profits from a single client or customer, and we examine the sufficiency of the evidence regarding causation of damages only as to Global's claim for lost profits caused by the alleged misappropriation of trade secrets, which is a subset of the actionable conduct alleged by Global and referred to by Spilker. We conclude that the *Swinnea* case is not on point. *See id.* at 879–80.

[22] We need not and do not address the other issues raised by the Defendants.

against the Defendants, and we render judgment that Global take nothing against the Defendants.[23] We affirm the remainder of the trial court's judgment, in which the trial court ordered that Global take nothing against Hunter Leasing, L.P., Mark Massey, and Sam Lavergne.

/s/    Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Boyce and Jamison.

---

[23] In adjudicating the issues in this appeal, we need not and do not address the propriety of the Defendants' conduct.