**MHI PARTNERSHIP, LTD. and Mag Creek Partners, LP, Appellants**

v.

**CITY OF LEAGUE CITY, Texas, Kari Lynn Bowen–Zilkenat, et al., Appellees**

NO. 14–15–00457–CV

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed April 18, 2017

Ian Peter Faria, Ryan T. Kinder, John Paul Hoelscher, Houston, TX, for Appellants.

Andrew M. Edison, Houston, TX, Arnold G. Polanco, Friendswood, TX, for Appellees.

Panel consists of Chief Justice Frost and Justices Brown and Jewell.[12]

## OPINION

Kem Thompson Frost, Chief Justice

Claimants to refunded special assessments under a municipal statute appeal the trial court's judgment in an interpleader action. They challenge both the sufficiency of the evidence to support various fact findings and the methodology the trial court used to determine which claimants were entitled to the refunds. We sustain both challenges and conclude that the trial court erred in ordering refunds distributed to current property owners under a titleholder methodology rather than to the payers of the assessments on a pro rata basis. We reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1997 appellee/plaintiff City of League City, Texas (the "City") established the League City Public Improvement District Number One (the "District") for the development of a subdivision known as the

---

12. Originally, this case was submitted before a panel consisting of Chief Justice Frost and Justices McCally and Brown. After Justice McCally ceased to serve as a justice on this court, this case was resubmitted to the current panel of Chief Justice Frost, Justice Brown, and Justice Jewell.

Magnolia Creek Master Planned Community (the "Magnolia Creek Subdivision"). The District funds improvements, such as street lights, drainage facilities, and sidewalks, on certain defined properties within the District through an assessment levied on those properties. Typically, a developer arranges for these improvements at the developer's expense, and the District then reimburses the developer using funds obtained from levying the assessments on the properties.

### The Levy of Assessments

In April 2001, the City adopted Ordinance 2001–10, in which the City approved a "Service and Assessment Plan" for the District. This plan provided an estimate for improvement costs and for assessing these costs to property owners within each phase of the development. In the Ordinance, the City levied a special assessment for Phase 1 of the Magnolia Creek Subdivision. The City set this assessment at the rate of $1.32 per square foot, levied equally on 2,087,376 square feet of property located in the District and consisting of 184 single-family lots and approximately 254,000 square feet of commercial property. The City calculated this rate based on $2.76 million in estimated costs to construct the improvements in Phase 1. The special assessment was payable in installments due on January 31 of each year beginning in 2002 and running through 2017, incorporating an interest rate of 7.25% per year. Each assessment was secured by a lien against the property assessed and constituted a personal liability of the owners of that property. The owner of any assessed property at any time could avoid paying future interest by paying the principal amount of the assessment along with accrued interest.

The following year, in October 2002, the City adopted Ordinance 2002–46, in which the City levied a special assessment for Phase 2 of the Magnolia Creek Subdivision. The City set this assessment at the rate of $1.68 per square foot, levied equally on property located in the District consisting of 134 single-family lots. The rate was calculated based on $2.25 million in estimated costs to construct the improvements in Phase 2. Each assessment was secured by a lien against the property assessed and constituted a personal liability of the owners of the property. At any time, the owner of any assessed property could avoid paying future interest by paying the principal amount of the assessment along with accrued interest.

### The Appellants' Special–Assessment Payments

Appellants/defendants MHI Partnership, Ltd. and Mag Creek Partners, LP [1] (collectively, the "MHI Parties") purchased and developed various residential lots located within the Magnolia Creek Subdivision. The MHI Parties ultimately sold these properties to third parties, but during their ownership of these properties, the MHI Parties made special-assessment payments.

### The City's Reassessment and the Claims Process

Following completion of the improvements in Phases 1 and 2 of the Magnolia

1. In its petition, the City refers to the second appellant in this appeal as "Mag Creek Partners, LP." William A. Haycraft, in an affidavit filed in the trial court, states that he is the Controller for Mag Creek Partners and that the name of this entity is "Mag Creek Partners, LP." But, in its answer in the trial court and in its appellate briefing in this court, Mag Creek Partners has referred to itself as "Mag Creek Partners, Ltd." We need not determine the proper name of the second appellant to adjudicate this appeal. In this opinion, we will refer to the second appellant as "Mag Creek Partners, LP," without making a determination as to the correct name.

Creek Subdivision and reimbursement to the developer, the City commissioned a public accounting firm to conduct an audit to reconcile the actual cost of Phase 1 and Phase 2. The results of the audit showed that the actual cost for Phase 1 was only $1.881 million, and the actual cost for Phase 2 was only $1.785 million. The City had more than $1.7 million in excess funds after the developer had been reimbursed in full.

In August 2013, the City adopted Ordinance 2013–38, in which the City made a reassessment pursuant to Local Government Code section 372.020. Under this reassessment, the City revised the rate for the Phase 1 special assessment from $1.32 per square foot to $0.90 per square foot, and the City changed the rate for the Phase 2 special assessment from $1.68 per square foot to $1.11 per square foot. In this ordinance, the City stated that the District would no longer collect assessments on Phase 1 or Phase 2 properties. The City also provided that "[t]here currently exists a balance of Phase 1 and Phase 2 excess PID assessments in the fund of [the District] that will be administered and refunded to parties having an interest in such funds."

After completing the reassessment, the City attempted to administer a refund process for property owners. The City commissioned a title examination on the affected properties within Phase 1 and Phase 2 and hired a title company to administer the claims process. The City allocated the excess funds back to the individual property accounts based upon square footage of the property, applying the same method used for levying the special assessments. The City then determined a maximum available refund for each property within the District.

The City notified everyone in the chain of title for the affected properties and gave them an opportunity to submit a claim form to the title company. The City received competing claims from 515 claimants affecting 259 of the properties in Phase 1 or Phase 2 of the of the Magnolia Creek Subdivision. The City determined that only $1,286,653.86 of the excess funds (hereinafter the "Disputed Funds") related to the 259 properties with multiple claims. The City consulted the city attorney to resolve the competing claims, but the City was unable to determine who was legally entitled to the funds.

### The City's Interpleader Lawsuit and the Trial Court's Judgment

The City filed its "Petition in Interpleader" in the trial court in March 2014, naming the 515 claimants who submitted competing claims as defendants. The MHI Parties were among the named defendants. The City alleged that it was subject to rival claims to the Disputed Funds and sought interpleader relief so that the trial court could determine to whom the refund payments should be made and in what amounts. The trial court granted the City's "Motion to Deposit Funds" and ordered the Disputed Funds deposited into the court registry in a non-interest-bearing account.

Following service of process, approximately 270 defendants, including the MHI Parties, filed answers to the City's petition. Some defendants filed only an answer without asserting any claim to the Disputed Funds. Many other defendants answered and asserted claims to the Disputed Funds. Some defendants attached to their answers claim forms and other documents they previously had submitted to the title company. Some defendants referred to their claim documents but did not attach them to their answer. Some defendants asserted a claim to the Disputed Funds but did not refer to or attach

any claim documents. Seven individuals who were not named defendants also filed answers to the City's petition.[2]

The record does not reflect that the trial court signed a pre-trial order granting the City interpleader relief and discharging the City. Nor does the record reflect that the trial court established a procedure for the defendants to present or prove their claims to the Disputed Funds. Instead, the trial court set the entire case [3] for a bench trial.

Before trial, the MHI Parties filed a brief asking the trial court to order the that the Disputed Funds be allocated for each property to the owners who made one or more special-assessment payments based upon a pro rata formula, taking into account the proportionate amount paid by each owner against the entire amount of special-assessment payments made for each property.

At the bench trial that followed, the City and seven defendants appeared.[4] The only witness who testified at trial was the City's Director of Finance, Rebecca Underhill. The trial court admitted into evidence a copy of the 2001 and 2002 ordinances, a spreadsheet showing the aggregate amount of the excess assessments, and a spreadsheet showing the competing claims to the Disputed Funds. The trial court did not state that it was admitting into evidence or deeming in evidence at trial any documents submitted in the City's claims process or attached to the defendants' answers or the parties' other pre-trial filings. At trial, no defendant offered any evidence in an attempt to prove any claim to the Disputed Funds. The MHI Parties and appellees/defendants Dona and Dordon Burke appeared and argued that the refund payments should be made on a pro rata basis. Appellee/defendant James Nebout also argued to the court during trial.

After trial, the trial court rendered a final judgment ordering that the funds available for each property (with one property excepted [5]), be distributed to "the legal title owner(s) of [each property] appearing of record as of [the date of the trial court's judgment]." The trial court thus decreed that the refund amount that the City had calculated for each property with competing claims be paid to the person or persons holding record title to each property as of the date of the trial court's judgment. The trial court ordered the City to submit a final statement showing who owned record title to each property and the amount allocated by the City to each property. The court stated that, with that information, the court clerk then would

---

2. These seven individuals, the defendants who filed answers, and the City are the appellees in this appeal.

3. In the trial court, the defendants were divided into seven groups and assigned what appear to be cause numbers 14–CV–0340, 14–CV–0340–A, 14–CV–0340–B, 14–CV–0340–C, 14–CV–0340–D, 14–CV–0340–E, and 14–CV–0340–F. Though it might appear that the trial court had ordered a severance, the record reflects that the designations were an administrative device rather than the result of a severance. The record shows that trial court did not order a severance, and all parties and claims were in cause number 14–CV–0340 in the trial court.

4. The following defendants appeared at trial: the MHI Parties, Dona Burke, Dordon Burke, Sequoia Golf Magnolia Creek, LLC, Mag Creek Golf Course, LP, and James Nebout.

5. The competing claimants regarding the golf-course property agreed to an allocation of the refund amount as to that property, and the trial court ordered the refund for that property to be distributed according to the claimants' agreement as stated in their joint motion. No party has challenged this part of the trial court's judgment on appeal, and we do not address this part of the trial court's judgment or find any error in it.

distribute the interpleader funds in accordance with the statement provided. The trial court further ordered that all claims against the City "arising from the interpleader are barred."

The City filed a final statement with the information ordered by the trial court. In this statement, the City also identified whether the ownership of each property had changed between September 1, 2013 (just after the reassessment effected in the 2013 Ordinance) and the time of the trial court's final judgment. The statement showed that ownership in at least forty-two of the properties had changed during this time period. The City later filed an amended final statement that did not reflect whether the ownership of each property had changed between September 1, 2013 and the time of the trial court's final judgment.

The trial court signed findings of fact and conclusions of law. The MHI Parties timely perfected this appeal from the trial court's judgment. No other parties have appealed.

## II. ISSUES AND ANALYSIS

In seven appellate issues, the MHI Parties assert that the evidence is legally or factually insufficient to support the trial court's findings of fact 8, 9, 10, 11, 19, 20, 21, 22, 31, 32, 33, and 34. The MHI Parties also challenge the trial court's conclusion of law number 6, in which the trial court determined that the refund amount that the City had calculated for each property with competing claims be paid to the person or persons holding record title to each property as of the date of the trial court's judgment.

 We review the trial court's conclusions of law de novo. *See Staley Family P'ship v. Stiles,* 483 S.W.3d 545, 548 (Tex. 2016). When reviewing the legal sufficiency of the evidence to support the trial court's

fact findings, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

**A. Is the trial evidence legally sufficient to support findings of fact 8, 9, 11, 19, 20, and 22?**

 In their first issue, the MHI Parties challenge the legal sufficiency of the evidence to support the following fact findings:

8. [The MHI Parties] were paid with taxpayer assessments to implement Phase 1 pursuant to the [Service and Assessment Plan];

9. Any assessments paid by [the MHI Parties] were returned to them by virtue of payments received under the [Service and Assessment Plan];

. . .

11. [The MHI Parties'] role in, and receipt of taxpayer payments as developers of, Phase 1 distinguishes them from a traditional ad valorem claimant;

. . .

19. [The MHI Parties] were paid with taxpayer assessments to implement Phase 2 pursuant to the [Service and Assessment Plan];

20. Any assessments paid by [the MHI Parties] were returned to them by

virtue of payments received under the [Service and Assessment Plan];

. . .

22. [The MHI Parties'] role in, and receipt of taxpayer payments as developers of, Phase 2 distinguishes them from a traditional ad valorem claimant;

No trial evidence showed that the MHI Parties were paid with taxpayer assessments to implement Phase 1 or Phase 2. No trial evidence showed that the MHI Parties received payments under the Service and Assessment Plan. No trial evidence showed that the MHI Parties received taxpayer payments as developers of Phase 1 or Phase 2. After reviewing the trial evidence under the applicable standard of review, we conclude that the evidence at trial is legally insufficient to support findings of fact 8, 9, 11, 19, 20, and 22. *See Hunter Buildings and Mfg., L.P. v. MBI Global, L.L.C.*, 436 S.W.3d 9, 17–22 (Tex. App.–Houston [14th Dist.] 2014, pet. denied). We thus sustain the MHI Parties' first issue to the extent it is based on a legal-sufficiency challenge.[6]

**B. Is the trial evidence legally sufficient to support findings of fact 10, 21, 31, 32, 33, and 34?**

■ In their second, third, and fourth issues, the MHI Parties challenge the legal sufficiency of the evidence to support the following fact findings:

10. [The MHI Parties], as initial sellers, passed on any remaining costs of Phase 1 assessments to third party purchasers;

21. [The MHI Parties], as initial sellers, passed on any remaining costs of Phase 2 assessments to third party purchasers;

31. The claims forms process required the production of warranty deeds by claimants (also known as [the MHI Parties]) who were currently in possession of an account property;

32. The claims forms process required the production of warranty deeds by claimants (also known as [the MHI Parties]) who were in possession of an account property as of [the date of the trial court's final judgment];

33. The warranty deeds produced by claimants that were legal title owners as of [the date of the trial court's final judgment] did not reserve or otherwise authorize a refund to any prior owners and/or possessors of the account property subject to the [ ] refund;

34. The warranty deeds produced by claimants that were legal title owners as of [the date of the trial court's final judgment] obligated and entitled those legal title owners to possess the property, make all necessary payments on the property, assume all necessary liabilities arising from the possession and ownership of the property and receive all refunds from [the District] on the property.

No trial evidence addresses the costs, if any, that the MHI Parties, as initial sellers, passed on to third-party purchasers. No trial evidence shows that the claims-forms process required the production of warranty deeds by claimants who currently were in possession of an account property. No trial evidence shows that the claims-forms process required the production of warranty deeds by claimants who

6. To the extent the first issue challenges the factual sufficiency of the evidence we need

not address it because we conclude that the evidence is legally insufficient.

were in possession of an account property as of the date of the trial court's final judgment. The trial evidence does not contain any warranty deeds, nor does the trial evidence address the contents or substantive effect of any provision of a claimant's warranty deed.[7] After reviewing the trial evidence under the applicable standard of review, we conclude that the evidence is legally insufficient to support findings of fact 10, 21, 31, 32, 33, and 34. *See Hunter Buildings and Mfg., L.P.*, 436 S.W.3d at 17–22. We thus sustain the MHI Parties' second, third, and fourth issues to the extent they are based on a legal-sufficiency challenge.[8]

**C. Did the trial court err in concluding that the refund amount for each property should be distributed to the holder of record title to each property as of the date of the trial court's judgment?**

In their sixth issue, the MHI Parties challenge the trial court's distribution methodology. They assert that the trial court erred as a matter of law in determining that the refund amount for each property should be distributed to the holder of record title for each property on the date of the trial court's judgment. The MHI Parties ask this court to reverse the trial court's judgment and render judgment that the interpleaded funds be distributed for each property to the property owners who paid the assessments at the initial rates based on a pro rata formula, taking into account the proportionate amount paid by each owner against the entire amount paid into the District for each property.

The Public Improvement District Assessment Act provides for reassessments if the governing body determines that the original assessment was excessive, but the Act does not address how excess assessments should be distributed. *See* Tex. Local Gov't Code Ann. § 372.001 *et seq.*; § 372.020 (West, Westlaw though 2015 R.S.). City Ordinance 2001–10 and City Ordinance 2002–46 do not address this issue, either. City Ordinance 2013–38 does not contain specific instructions as to who should receive the excessive assessments. Nonetheless, the reassessment ordinance provides some guidance on the issue:

> There currently exists a balance of Phase 1 and Phase 2 excess PID assessments in the fund of [the District] that will be administered and refunded to parties having an interest in such funds.

We review the trial court's interpretation of applicable statutes de novo. *See Johnson v. City of Fort Worth*, 774 S.W.2d 653, 655–56 (Tex. 1989). In construing a municipal ordinance, we seek to determine and give effect to the intent of the governing body of the municipality. *See Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000). If possible, we must ascertain that intent from the language the governing body used in the statute and not look to extraneous matters for an intent the statute does not state. *Id.* If the meaning of the statutory language is unambiguous, we adopt the interpretation supported by the plain meaning of the provision's words. *St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex. 1997). We must not engage in forced or strained construction; instead, we must

---

7. Nebout mentioned warranty deeds during his argument at trial, but he did not offer any evidence at trial.

8. To the extent the MHI Parties challenge the factual sufficiency of the evidence in these issues we need not address them because we conclude that the evidence is legally insufficient.

yield to the plain sense of the words the governing body chose. *See id.*

Under City Ordinance 2013–38, the excess assessments are to be "refunded to parties having an interest in such funds." In this context, the plain meaning of the word "refunded" is "pa[id] back by the party who has received it, to the party who has paid it." *City of Grand Rapids v. Iosco Land Co.,* 273 Mich. 613, 263 N.W. 753, 755 (1935) (discussing definition of "refund" as used in statute regarding refund of real-property assessments) (quotations and citation omitted); *accord Asmer v. Livingston,* 225 S.C. 341, 82 S.E.2d 465, 467 (1954); *see also* Black's Law Dictionary 1307 (8th ed. 2004) (defining "refund" as "the return of money to a person who overpaid, such as a taxpayer who overestimated tax liability or whose employer withheld too much tax from earnings"). Under the unambiguous language of City Ordinance 2013–38, the excess assessments should be paid back to the parties who paid the assessments. *See City of Grand Rapids,* 263 N.W. at 755 (holding that use of word "refund" in statute providing for a refund of assessments paid by certain landowners showed the legislature's intent that the money be distributed to the landowners who paid the assessment rather than to current landowners who did not pay any of the assessment).

█ By ruling that the refund amounts would be paid to the parties owning the subject properties on the judgment date, the trial court did not give effect to the statutory language. Instead, the trial court ordered that refunds be made to property owners, even if the owners *never made any* special-assessment payments in the past. Indeed, according to the first final statement filed by the City, ownership in at least forty-two of the subject properties had changed between City Ordinance 2013–38's adoption and the judgment date. The trial court's title-holder methodology undercuts the operative words of the ordinance. Paying money from the excess-assessment fund to a property owner who did not make any special-assessment payments is not a "refund."[9] *See Asmer,* 82 S.E.2d at 467; *City of Grand Rapids,* 263 N.W. at 755. It is a windfall. Absent an express instruction in the ordinance to pay excess assessments to claimants who have not made the assessment payments, it would be unreasonable to construe the ordinance as sanctioning that methodology. *See Asmer,* 82 S.E.2d at 467; *City of Grand Rapids,* 263 N.W. at 755. Had the City's governing body intended to distribute the surplus assessments to current title-holders, the governing body easily could have said so. Instead, the governing body chose to "refund" the assessments. And, because a refund cannot go to a person who did not pay in the first place, the title-holder methodology does not fit within the terms of the ordinance.

Though property owners paid special assessments based on their ownership of a property and though the assessment was enforceable by a lien against that property, these facts do not mean that the interest in a potential refund of excess assessment payments is an interest in the property that passes with the land to the current owner of the property. *See City of Grand Rapids,* 263 N.W. at 755. Rather, the interests in potential refunds of excess assessments are personal rights belonging to the ones who actually paid the assessments, without regard to whether they own the properties at the time of the refunds. *See id.*

9. The parties have not cited and research has not revealed any Texas case addressing the manner of calculating a refund of excess assessment payments; however, there are cases from other states addressing this type of fact pattern.

Presuming for the sake of argument that the MHI Parties were developers who were reimbursed with funds generated by the special assessments, the MHI Parties' receipt of assessment funds to reimburse their expenses in their capacity as developers does not deprive them of their interest in excess assessment funds to the extent that the MHI Parties paid special assessments in their capacity as owners of some of the properties. Because City Ordinance 2013–38 does not exclude developers from receiving refund payments, even if the MHI Parties were developers, this status would not bar them from receiving refund payments based on the special assessments they paid.

We conclude that, under the unambiguous text of Ordinance 2013–38, a claimant to the refund attributable to a subject property should receive a share of the refund in an amount proportionate to the share of the total amount of assessments paid on the property that the claimant paid. *See Perlmutter's, Inc. v. Ancell*, 153 Colo. 149, 385 P.2d 123, 123–26 (1963) (holding that grantee in a warranty deed did not acquire the right of the grantor to the refund of a building-inspector fee paid by the grantor); *City of Grand Rapids*, 263 N.W. at 755 (holding that under a statute providing for a refund of assessments paid by certain landowners, the refund should be paid to the owners who paid the assessment and not to current owners of the property who did not pay any of the assessment); *Marano v. North Bergen Township*, 116 N.J. Eq. 196, 172 A. 817, 817–18 (1934) (holding that refund of excess assessments paid on real property should be paid to prior landowner who paid the assessments rather than to

current landowner). If a claimant paid one hundred percent of the property's assessments, the claimant should receive the entire refund for that property. If one claimant paid forty-two percent of all the assessments paid on a property and another claimant paid fifty-eight percent of all the assessments paid on a property, the first claimant should receive forty-two percent of the refund and the second claimant should receive fifty-eight percent of the refund. If a claimant did not pay any of the assessments on the property, the claimant should not receive any part of the refund for that property. By ordering distribution of the Disputed Funds on a different basis, the trial court reversibly erred. Though we conclude as a matter of law that the trial court should have ordered the Disputed Funds distributed on this basis, we cannot render judgment on appeal because a remand is necessary for further proceedings. *See* Tex. R. App. P. 43.3.

We sustain the MHI Parties' sixth issue.[10] We reverse and remand to the trial court. On remand, the trial court, among other things, shall (1) determine the amount of special-assessment payments made by each claimant on each of the subject properties for which the claimant seeks a refund, and shall resolve any material fact issues by trial; (2) determine the amount, if any, of the refund to which each claimant is entitled on each of the subject properties based on the pro rata formula articulated above, resolving any material fact issues by trial, and (3) order these refunds distributed to the claimants entitled to receive the refunds.[11]

---

10. We need not and do not address the MHI Parties' fifth and seventh issues.

11. These further proceedings do not apply to the competing claimants regarding the golf-

course property, who agreed to an allocation of the refund amount as to that property, as discussed in footnote five, above.

### III. CONCLUSION

The trial evidence is legally insufficient to support the trial court's findings of fact 8–11, 19–22, and 31–34. Under the unambiguous wording of City Ordinance 2013–38, the trial court reversibly erred in ordering distribution of refunds to the record owners of each property at the time of the trial court's judgment. The proper methodology is to distribute the refunds after proceedings to determine each claimant's proportionate share, if any, of the refund for the subject property, an amount which should be equal to the proportionate share of the total amount of assessments paid on the property that the claimant paid.

We reverse the trial court's judgment and remand for further proceedings in accordance with this opinion.