**Opinion issued August 16, 2018**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-18-00140-CV**

**NO. 01-18-00141-CV**

———————————

## IN THE INTEREST OF L.J.M., W.J.M., AND N.J.M., CHILDREN

## IN THE INTEREST OF S.S.M., A CHILD

———————————

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 2016-04727J, 2016-06662J**

———————————

## MEMORANDUM OPINION

In these termination of parental rights cases, S.M., Sr. (Father) appeals the trial court's decrees terminating his parental rights to his sons, L.J.M., W.J.M., and N.J.M., and to his daughter, S.S.M. In one issue on appeal, Father contends that the

Department of Family and Protective Services (DFPS or Department) failed to present factually sufficient evidence to support the trial court's finding that termination of his parental rights was in his children's best interest.

We affirm.

## Background

Father and S.C. (Mother) have four children who are the subjects of these appeals: L.J.M. ("Luke"), who was born in April 2013; W.J.M. ("Wesley"), who was born in May 2014; N.J.M. ("Nathan"), who was born in October 2015; and S.S.M. ("Samantha"), who was born in December 2016, while the underlying suit involving her older brothers was already pending.[1] Father has three older children from a previous relationship who were not involved in these proceedings.[2] Mother is not a party to this appeal.

---

[1]   We refer to the children by pseudonyms to protect their privacy and for ease of reading. The suit involving the termination of Mother's and Father's parental rights to Luke, Wesley, and Nathan was tried in trial court cause number 2016-04727J and resulted in appellate cause number 01-18-00140-CV. The suit involving the termination of Mother's and Father's parental rights to Samantha was tried in trial court cause number 2016-06662J and resulted in appellate cause number 01-18-00141-CV. The trial court terminated both Mother's and Father's parental rights. Mother did not appeal the trial court's decrees of termination.

[2]   The trial court admitted evidence that DFPS had been involved with Father's older children. Specifically, in 2011, one of Father's children tested positive for opiates at birth. DFPS had also received referrals that, in February 2014, Father struck two of his older children and that, in April 2014, Father's older children "were spotted sitting in the middle of the road outside of their house and almost got run over by an oncoming car."

DFPS first became involved with the children in November 2014. In an affidavit supporting the petition to terminate Mother's and Father's parental rights,[3] DFPS caseworker Montoyua Ponder averred that the Department received a referral that the family's home contained "physical and sanitary hazards such as broken windows, animal/human feces and roaches/rodents." DFPS assisted the family in moving to a new home. DFPS received an additional referral of neglectful supervision in January 2016 when Wesley, who was not quite two years old at the time, "was found crawling in the middle of a busy street a good distance from his home." DFPS also received a referral of physical neglect in March 2016 because of "concerns that the home environment of the children was deplorable." All three of these cases were "ruled out," and Ponder averred that "the family made great strides to clean the home and [Mother and Father] also placed chain locks on both entry doors."

Ponder averred that DFPS sought temporary managing conservatorship of Luke, Wesley, and Nathan as well as termination of Mother's and Father's parental rights to the children after two further referrals in July and August of 2016. In the first referral, in July 2016, the Department received a report that three-year-old Luke had a habit of leaving the home and "wandering the streets" while Mother was busy with his younger brothers, sometimes late at night, and that neighbors would bring

---

[3] The trial court admitted this affidavit into evidence at the final hearing.

3

him back home. On one particular occasion, Luke escaped the house while Mother was bathing the younger children, and he was hit by a car. An ambulance took Luke to the hospital, but he did not have serious injuries from this incident. Ponder averred that she recommended that Mother and Father clean the home and that they purchase sliding locks for both doors to prevent the children from leaving the home unnoticed. Ponder stated that, during her visit to the home, she observed Luke leave the house without Mother and Father noticing.

Ponder further averred that DFPS received another referral in August 2016. DFPS received a report that Luke had been examined at a local hospital for "ligature marks" on both his ankles. The marks "were almost to the bone" and "appeared to be infected." According to Mother and Father, Luke discovered a pair of handcuffs that Father owned and he placed the handcuffs around his own ankles. Mother reported that she and Father were unable to find the key to the handcuffs, so they used various tools, including a saw and metal cutters, to remove the handcuffs. Mother cleaned the wounds on Luke's ankles and used antibacterial ointment, but she and Father waited several days before seeking medical attention for Luke and did not "call for help because it would look like abuse and they were scared." Upon DFPS's insistence, Luke was admitted to Texas Children's Hospital for treatment.

Ponder attached Luke's medical records to her affidavit. Dr. Rebecca Chancey, the attending physician at Texas Children's Hospital, reported that Luke

had "denuded skin" and "deep open wounds" over both of his ankles that "require[ed] plastic surgery evaluation and likely skin grafting," and he also had a recent buckle fracture to his left shoulder and an old, healing fracture to his right arm. Dr. Chancey stated that Luke's wounds were not consistent with Mother's and Father's explanations and that his fractures "show[ed] evidence of abuse in the past." Dr. Chancey also examined Wesley and Nathan. Neither of these children was injured, although, upon reviewing Wesley's medical records, Dr. Chancey noted that Wesley had a history of medical issues and that he needed follow up visits with neurology and cardiology specialists. The trial court admitted Luke's and Wesley's medical records into evidence at the final hearing.[4]

On August 25, 2016, the day after Luke was admitted to the hospital, DFPS filed its petition seeking managing conservatorship over Luke, Wesley, and Nathan and seeking the termination of Mother's and Father's parental rights. The trial court entered an order naming DFPS the temporary managing conservator of the children, and the court also ordered that Mother and Father have no visitation with the children until further order of the court. The trial court also approved family service plans for

---

[4] Wesley's medical records indicated that he suffered from a pulmonary hemorrhage when he was a newborn and that Mother and Father missed his follow-up cardiology appointments and did not provide a reason for this failure. Medical records also indicated that Wesley experienced several seizures when he was around one year old and he was diagnosed with periventricular leukomalacia, developmental delay, and gross motor delay. The records stated that Wesley was "at risk of developing epilepsy and cerebral palsy."

Mother and Father, requiring them to complete a parenting course, participate in individual counseling and a psychosocial assessment, obtain legal employment and stable housing, and submit to drug testing.[5]

In September 2016, Mother and Father were charged with the felony offense of injury to a child arising out of the August 2016 incident involving Luke and the handcuffs. The trial court admitted into evidence a copy of the probable cause affidavit completed by Houston Police Department Officer D. Marshall, who investigated the possibility of physical abuse after Luke was treated at Texas Children's Hospital. Officer Marshall averred that Mother told him that Luke had put the handcuffs around his own ankles and that she could not locate the key. She further stated that, after searching for the key for five hours, she and Father had to cut the handcuffs off of Luke's ankles because Luke started losing circulation in his feet. Officer Marshall averred:

> [Mother] stated they tried to cut the handcuffs with a sawzall, followed by a knife sharpener, and then ultimately was successful when using a grinder. [Mother] stated that [Father] used the grinder while [Mother] held [Luke], who was scared and crying, down. [Mother] had one arm on [Luke's] upper body and the other arm on [Luke's] legs. [Mother] stated it took about 5 hours to grind the handcuffs off, and caused [Luke] more injuries—burns from the heat of the grinder and cuts to his skin. [Mother] further stated that the grinding made the cuffs dig deeper and deeper into [Luke's] skin.

---

[5]    At the final hearing, the trial court admitted testimony and exhibits indicating that Mother tested positive for marijuana use in September 2016. Father tested positive for alcohol use in September 2016 and July 2017, and he tested positive for marijuana use in January 2017.

> After the handcuffs were removed, [Father and Mother] did not seek immediate medical treatment for [Luke's] injuries. Instead, [Mother] stated she let the injuries air dry. When the wounds started to get red and infected. [Mother] told [Father] to take [Luke] to the doctor. [Mother] stated, "I know we should have taken him on the first day, but we didn't." [Luke] was taken to the doctor on Tuesday, August 23, 2016, approximately 4 days after the incident.
>
> Affiant knows from his 10 years of training and experience that handcuffs have a universal key. If [Father] or [Mother] had contacted first responders or law enforcement, the handcuffs could have been easily removed with any handcuff key. The defendants' failure to get the handcuffs removed in a timely manner by making contact with law enforcement caused [Luke's] injuries and could have easily been avoided.
>
> Affiant met with Dr. M. Donaruma, who is a child abuse pediatrician at Texas Children's Hospital, and found her to be credible and reliable. Dr. Donaruma stated that [Luke's] scarring and injuries will have permanent disfigurement and will cause difficulties for [Luke] as he grows taller. Dr. Donaruma further stated that the delay in removing the handcuffs caused serious disfigurement, significant pain, and risk of infection.

Mother stated to Officer Marshall, "We didn't want to get the cops involved because we knew what would happen." Mother ultimately pleaded guilty to the offense of injury to a child in August 2017, and the criminal court assessed her punishment at two years' confinement. At the time of the final hearing in the underlying termination proceedings, Father had not yet been to trial on the injury to a child charge.

While Mother was in custody during the pendency of the injury to a child charge, she gave birth to Samantha in December 2016. DFPS immediately filed a petition seeking to be named Samantha's temporary managing conservator and

7

seeking termination of Mother's and Father's parental rights to Samantha. In the affidavit supporting the termination petition, which was admitted into evidence at the final hearing, DFPS caseworker Monique Norman averred that Samantha was born while Mother was in custody at the Harris County Jail and that Mother would return to the jail in several days, but "it is unknown who will take custody of" Samantha. Norman averred that Father had also been charged with injury to a child but had been released on bond, and DFPS had been unable to contact Father to discuss a placement for Samantha. Mother had provided Norman with the names of several family members who she thought might be able to take care of Samantha, including Mother's father ("Grandfather"), but Norman was not able to make contact with any of the people Mother had named as potential caregivers. The trial court signed an order naming DFPS as Samantha's temporary managing conservator.

In October 2017, Grandfather and his fiancée filed a petition in intervention, seeking to be named managing conservators of the children, or, if Mother's and Father's parental rights were terminated, seeking to adopt the children. Jessica Gomez, the DFPS caseworker assigned to the children, completed a "Preliminary Kinship Caregiver Home Assessment" of Grandfather's home in January 2018. Four people lived in Grandfather's home, including Grandfather, his fiancée, a friend of Grandfather, and that friend's twelve-year-old grandson. Grandfather did not have a criminal history or a history with DFPS, but his fiancée had been referred to DFPS

for neglectful supervision in 2007 and also had several past arrests. Grandfather and his fiancée "stated they are willing to care for the children and protect them in any way possible, even if that means they do not let [Mother] come and visit," but "[t]he caseworker was not very confident the potential caregivers were telling the truth." Gomez listed several potential concerns about the placement, including Grandfather's fiancée's criminal and DFPS history; the lack of running water at the house during Gomez's visit; Grandfather's plan for the three older children—including Luke, who had a history of escaping Mother's and Father's house—to sleep in the front room next to the front door; Grandfather's plan for Samantha to sleep in a bed in the room he shared with his fiancée, which did not have a door; and Grandfather's fiancée's attempts to get custody of her four grandchildren, "which will put 8 children, age 11 and younger" in their care. Gomez recommended denial of Grandfather's house as a placement for the children.

At the final hearing, Gomez testified concerning the events that had brought the children into DFPS's care, including the incident in which Luke left the house and was hit by a car and the incident in which Luke had "severe ligature marks on his ankles" and the treating doctors believed that his injuries were "consistent with physical abuse." The trial court admitted photographs of the injuries to Luke's ankles. Gomez testified concerning Mother and Father's explanation for Luke's injuries, which was that Luke climbed up five or six drawers of a dresser to pull

9

handcuffs out of the top drawer, which he then secured around his ankles. Mother and Father could not find the key to the handcuffs, so they tried several different methods to remove the handcuffs before succeeding with an electric grinder. Mother and Father "did not initially take [Luke] to the doctor or call for help because they knew that they had a CPS case open and they did not want it to look like child abuse." Gomez testified that Luke's medical records showed that he had a new fracture to his shoulder and a healing fracture to his wrist, which the attending physician ruled "non-accidental."

Gomez testified that both Mother and Father completed the parenting course required by their family service plans. Father, however, did not maintain contact with DFPS, he did not participate in individual counseling or in a psychosocial assessment, he did not provide proof of legal employment, he did not provide proof of stable housing, and he did not participate in regular drug testing. Gomez also testified that while Mother was no longer incarcerated at the time of the final hearing, she did not have current contact information for Mother, and she did not know where Mother was located.

Gomez testified that Luke, Nathan, and Samantha were currently placed in a foster home together, and Wesley was placed in a separate foster home. Gomez stated that, during the pendency of the proceedings, Wesley was diagnosed with

10

cerebral palsy, and the foster parents taking care of Luke, Nathan, and Samantha determined that they could not also take care of Wesley due to his special needs.

Gomez further testified that Grandfather had contacted her and asked to be considered as a placement for the children, but she testified that she would not be in favor of that placement. Gomez stated that she did not believe Grandfather's house was a safe place for the children due to his fiancée's criminal history and a lack of "adequate space of living."

Gomez stated that termination of Mother's and Father's parental rights to the children would be in their best interest. She testified:

> It's in their best interest due to the fact that they are now being taken care of and not neglected as previous CPS investigations have found. They are being provided all of the needs that they need, including therapeutic needs, stable housing, clothes. They're clean. The children have progressed a lot. [Luke] is speaking a lot more. [Wesley] has learned to walk. [Wesley] is speaking a lot more. The children are going to be in a home free from drug use and abuse—physical abuse.

The trial court admitted a permanency report completed by DFPS in December 2017, and this report reflected that the children were doing well in their current placements, Luke and Wesley were receiving therapy, the children were bonded to their caregivers, and the children—Wesley and Nathan in particular—enjoyed their visits with each other. Gomez stated that there was a good chance of finding an adoptive home for the children if the trial court terminated Mother's and Father's parental rights.

11

Lisa McCartney, an expert in "the welfare, safety, and placement of children," testified that, in her opinion, the children should not be separated because it "would be damaging to their emotional and physical well being" and that Wesley and Nathan, in particular, should be placed together. McCartney also testified that both Luke and Wesley had special needs: Luke had been diagnosed with "a lot of learning disabilities" and was taking medication for ADHD and Wesley had been diagnosed with cerebral palsy. McCartney testified that both Nathan and Samantha were "developmentally on target" and there were no concerns regarding their health. McCartney stated:

> The children have had so many moves in their short lives, from different placement to different placement and their history of significant abuse and neglect at the hands of their parents, they need to, you know, not be moved until their final destination. So my recommendation would be to do a legally free broadcast on these children nationwide. I think these children are adoptable and that we can find—I think we'll get a lot of homes because they're legally free. . . . And these kids don't need—they need permanency. They need to be together and they need permanency and they need the right family that is prepared to deal with two children with special needs.

McCartney recommended that, while DFPS waits to find a family that can adopt all four children, the children remain in their current placements.

The trial court signed decrees terminating Mother's and Father's parental rights to the children under Family Code subsections 161.001(b)(1)(D), (E), and (O). The trial court also found that termination of both parents' parental rights was in the best interest of the children and appointed DFPS as the children's sole managing

12

conservator. The trial court's final decrees dismissed Grandfather's suit in intervention. Father's appeal followed.

**Best Interest of the Children**

In his sole issue on appeal, Father contends that DFPS failed to present factually sufficient evidence to support the trial court's determination that termination of his parental rights was in the best interest of the children under Family Code section 161.001(b)(2). Father does not challenge the sufficiency of the evidence to support the statutory predicate grounds for termination under section 161.001(b)(1), nor does he challenge the legal sufficiency of the evidence supporting the trial court's best interest finding.

*A.    Standard of Review*

A trial court may order termination of the parent-child relationship if DFPS proves, by clear and convincing evidence, one of the statutorily enumerated predicate findings for termination and that termination of parental rights is in the best interest of the children. TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2017); *see In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (stating that federal due process clause and Texas Family Code both mandate "heightened" standard of review of clear and convincing evidence in parental-rights termination cases). DFPS must prove both elements—a statutorily prescribed predicate finding and that termination is in the children's best interest—by clear and convincing evidence. *In re E.N.C.*,

13

384 S.W.3d at 803. The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *In re E.N.C.*, 384 S.W.3d at 802.

When a parent challenges the factual sufficiency of the evidence supporting the trial court's findings, we review all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). We should inquire whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In applying this standard, our review "must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re H.R.M.*, 209 S.W.3d at 108 (quoting *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)); *see also In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (stating that we must still provide due deference to decisions of factfinder, which had full opportunity to observe witness testimony and was sole arbiter of assessing witness credibility and demeanor).

***B.***      ***Factors Relevant to Best Interest Determination***

"[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2017). There is a strong, but rebuttable, presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *see* TEX. FAM. CODE ANN. § 153.131(b) (West 2014); *Jordan v. Dossey*, 325 S.W.3d 700, 729 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (noting that parent-child relationship has constitutional underpinnings, but courts must not sacrifice child's emotional and physical interests "merely to preserve that right").

The Texas Legislature has set out several factors that courts should consider in determining whether a child's parent is willing and able to provide the child with a safe environment, including: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude and frequency of harm to the child; (4) whether the child has been the victim of repeated harm after the initial intervention by DFPS; (5) the willingness of the child's family to seek out, accept, and complete counseling services; (6) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and (7) whether the child's family demonstrates adequate parenting skills, including providing the child with

minimally adequate health and nutritional care, care consistent with the child's physical and psychological development, guidance and supervision consistent with the child's safety, a safe physical home environment, and an understanding of the child's needs and capabilities. TEX. FAM. CODE ANN. § 263.307(b).

The Texas Supreme Court has also set out several non-exclusive factors that we should consider when determining whether the termination of a parent's rights is in the child's best interest, including (1) the child's desires; (2) the child's current and future physical and emotional needs; (3) the current and future physical danger to the child; (4) the parental abilities of the person seeking custody; (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child; (6) the plans for the child by the person seeking custody; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not proper; and (9) any excuse for acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re A.C.*, 394 S.W.3d 633, 641–42 (Tex. App.—Houston [1st Dist.] 2012, no pet.). These factors are not exhaustive, and it is not necessary that DFPS prove all of these factors "as a condition precedent to parental termination." *In re C.H.*, 89 S.W.3d at 27. The absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or conviction that termination is in the children's best interest. *In re A.C.*, 394 S.W.3d at 642.

16

Proof concerning the statutory predicate findings under section 161.001(b)(1) does not relieve DFPS of its burden of proving that termination is in the children's best interest, but "the same evidence may be probative of both issues." *In re C.H.*, 89 S.W.3d at 28. The best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*; *see In re C.H.*, 89 S.W.3d at 28 (stating that past performance as parent "could certainly have a bearing on [parent's] fitness to provide for" child, and courts should consider prior history of child neglect in best-interest analysis). Although evidence concerning placement plans and adoption of the children are relevant to a best interest finding, the lack of evidence concerning definitive placement plans is not dispositive. *In re C.H.*, 89 S.W.3d at 28 ("[T]he inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest—even if the agency is unable to identify with precision the child's future home environment.").

## C.    *Analysis*

DFPS presented evidence that Father has a lengthy history with the Department, including referrals involving his older children who are not the subjects

of the underlying proceedings. *See id.* (noting that parent's prior history of child neglect is factor relevant to best interest finding); *In re E.A.F.*, 424 S.W.3d 742, 751 (Tex. App.—Houston [14th Dist.] pet. denied) ("A parent's past behavior is indicative of the quality of future care that the parent is capable of providing."); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 619–20 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (considering parent's past history with Florida CPS as evidence of lack of parenting abilities).

One of the referrals to DFPS involved a report that Father's older children were found sitting unsupervised in the middle of a street, where they were nearly hit by an oncoming car. With regard to the children involved in the present case, DFPS received a report that Wesley was found crawling in the street, and it received referrals that Luke frequently escaped the house without Mother and Father noticing and that, on one occasion, he was hit by a car, although he was not seriously injured. DFPS also received multiple referrals concerning the cleanliness of Mother's and Father's home, as well as the lack of safety features intended to keep the children from surreptitiously leaving the house, although the caseworkers noted that, during the pendency of DFPS's investigation, Mother and Father did make some progress in remedying these deficiencies. *See In re J.M.*, 156 S.W.3d 696, 707 (Tex. App.—Dallas 2005, no pet.) (stating that physical danger to children "now and in the future" was shown by father's "inability to keep a house safe for the children").

The record also included evidence concerning the severe injuries that Luke suffered when handcuffs became locked around his ankles and Mother and Father were unable to find the key to open the handcuffs. Mother stated that they did not immediately seek medical attention or call first responders because they already had an open DFPS case stemming from Luke's earlier escape from the house that led to his being hit by a car, and they knew it would appear as though they had abused Luke. Instead of immediately seeking help, Mother and Father tried several methods of removing the handcuffs, including using an electric grinder, which caused further injuries to Luke's ankles, and they did not seek medical attention for several days after the incident, when Luke's injuries had become infected. *See In re C.H.*, 89 S.W.3d at 28 (noting that father had failed to arrange medical care for child's mother during her pregnancy and failed to provide medical care for child); *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) (stating that courts may consider parent's inability to provide adequate care and poor judgment when determining best interest).

The attending physician at Texas Children's Hospital noted that Luke's injuries were severe enough that a plastic surgery consultation was necessary, as there was a possibility that he might need skin grafts, and the physician also noted that Luke had a new fracture to his left shoulder and a healing fracture to his right arm, both of which were indicative of physical abuse. *See In re J.D.*, 436 S.W.3d

19

105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (considering injuries child suffered while in parent's care and stating that factfinder may infer from parent's past inability to meet child's physical and emotional needs that parent would be unable or unwilling to meet those needs in future). Mother pleaded guilty to the offense of injury to a child arising out of this incident, and, at the time of the final hearing, Father was awaiting trial on the same charge.

DFPS presented Luke's and Wesley's medical records, which demonstrated that both children had special needs. Luke had been diagnosed with ADHD and he also had several learning disabilities, and Wesley had been diagnosed with cerebral palsy. Wesley's medical records reflected health issues from birth, including suffering from a pulmonary hemorrhage, several seizures, developmental delay, and gross motor delay. Wesley's medical records also indicated that Mother and Father had been told that, given his health issues, Wesley needed follow-up appointments with cardiology and neurology specialists, but Mother and Father repeatedly delayed making those necessary appointments for Wesley. *See In re C.H.*, 89 S.W.3d at 28.

Gomez, the DFPS caseworker, testified that both Luke and Wesley were receiving therapy and had made progress during their foster-care placements and that Nathan and Samantha, the two youngest children, were physically healthy and developmentally "on target." "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are

well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d at 118; *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Here, at the time the trial court named DFPS the temporary managing conservator of the children in August 2016, the court ordered that neither Mother nor Father should have any visits with the children "until further order of the court." The record contained no indication that, as of the time of the final hearing in January 2018, Father had had any visitation with the children. A permanency report dated December 4, 2017, and admitted into evidence at the final hearing, stated that the children were doing well in their current foster placements, they were bonded with their caregivers, and they enjoyed their visits with each other. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.) (considering, in assessing child's physical and emotional needs, that child was "healthy, happy, and well-adjusted" after approximately eighteen months in care of foster family).

DFPS also presented evidence that although Mother and Father had both completed a parenting course, as required by their respective family service plans, Father, in particular, had not completed several other requirements listed in his service plan. *See In re E.A.F.*, 424 S.W.3d at 752 (stating that, in assessing best interest, courts may appropriately consider whether parent complied with court-ordered family service plan for reunification with child). Gomez testified that Father had not maintained contact with DFPS, he had not participated in individual

counseling, he had not completed a psychosocial assessment, he had not provided proof of legal employment or stable housing, and he had not participated in "regular" drug testing. *See In re C.A.J.*, 122 S.W.3d at 893 (stating that "[w]ithout stability, income, or a home," parent was unable to provide for child's emotional and physical needs); *see also In re J.D.*, 436 S.W.3d at 120 (stating that stability of proposed home environment is important consideration in determining best interest); *In re E.A.F.*, 424 S.W.3d at 752 (noting that parent performed some court-ordered services, but did not establish that he maintained stable housing and employment). Gomez testified that Father had participated in sporadic drug testing throughout the pendency of the case, and, on one occasion, he tested positive for marijuana usage. *See In re D.R.A.*, 374 S.W.3d 528, 536 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (considering failed drug test, among other factors, as evidence that parent-child relationship was not appropriate).

Gomez further testified that terminating Mother's and Father's parental rights to the children was in their best interest, stating:

> It's in their best interest due to the fact that they are now being taken care of and not neglected as previous CPS investigations have found. They are being provided all of the needs that they need, including therapeutic needs, stable housing, clothes. They're clean. The children have progressed a lot. [Luke] is speaking a lot more. [Wesley] has learned to walk. [Wesley] is speaking a lot more. The children are going to be in a home free from drug use and abuse—physical abuse.

22

*See In re E.A.F.*, 424 S.W.3d at 752 (considering fact that child was healthy and doing well in foster home even though that was not potential adoptive placement). Gomez stated her belief that DFPS had a "good chance" of finding an adoptive home for the children if the court terminated Mother's and Father's parental rights. McCartney, an expert in child welfare and placements, testified that it was in the best interest of the children to remain in their current placements until DFPS could find a family willing to adopt all four children and that was able to care for two children with special needs. She emphasized that although Wesley was in a different placement from Luke, Nathan, and Samantha at the time of the final hearing, the children should be kept together for their final placement.

Father argues that DFPS failed to present factually sufficient evidence to support the trial court's best interest finding. Specifically, he argues that the trial court failed to recognize that the children "have a natural connection to their mother and father"; that the trial court "effectively severed the natural connection these children enjoy with their extended family," such as Grandfather and his fiancée, and severing these familial ties was not in their best interest; that terminating Father's parental rights denied the children "consistency, familiarity, and bonding"; and that the children should not "have been deprived of the continued opportunity to bond with their father."

Although there is a strong presumption that the best interest of a child is served by keeping the child with a parent, that presumption is rebuttable. *See* TEX. FAM. CODE ANN. § 153.131(b); *In re R.R.*, 209 S.W.3d at 116. As this Court has previously noted, although we must recognize the constitutional underpinnings of the parent-child relationship, we must not sacrifice the emotional and physicals interests of a child "merely to preserve that right." *See Jordan*, 325 S.W.3d at 729. Here, DFPS put on ample evidence that the emotional and physical interests of these children would best be served by terminating Father's parental rights. Father displayed a pattern of neglecting his children by failing to provide safe and clean housing and failing to adequately supervise his children, requiring repeated DFPS intervention. Father also demonstrated an unwillingness to seek necessary medical attention for his children, as indicated by the long delay in following up with specialists concerning Wesley's serious health needs and by his failure to seek immediate assistance for Luke's injuries after his ankles were trapped in handcuffs.

Father completed the parenting course required by his family service plan, but he did not complete any of his other required services. There is no indication in the record that Father possesses the parenting abilities or is willing to seek assistance from the Department or other support organizations to acquire the skills needed to raise his four young children, two of whom have special needs and require ongoing therapy. *See In re U.P.*, 105 S.W.3d at 231 (considering fact that father had not

24

shown how he intended to care for child with special medical needs); *see also In re J.E.M.M.*, 532 S.W.3d 874, 888–89 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (stating that parent's failure to complete clinician's treatment recommendations was some evidence "that she did not take advantage of the services the Department offered and so casts some measure of doubt on her parenting abilities"). Father asserts that he has a bond with his children, but that bond alone does not outweigh the evidence presented by the Department supporting the trial court's determination that terminating Father's parental rights was in the children's best interest.

In addressing the *Holley* factors and arguing that there is factually insufficient evidence to support the best interest finding, Father repeatedly points out that DFPS has not yet identified the children's potential adoptive caregivers, and therefore consideration of the children's future needs, future dangers to the children, parenting abilities of future caregivers, plans for the children by future caregivers, and stability of the proposed future home is speculative and uncertain. *See Holley*, 544 S.W.2d at 372 (listing factors courts have considered in determining best interest). The Texas Supreme Court has pointed out that the focus of the best-interest inquiry is whether there is sufficient evidence that termination of the parent's parental rights would be in the child's best interest; the lack of evidence concerning a definite placement for the children is not dispositive. *See In re C.H.*, 89 S.W.3d at 28. The fact that DFPS, at the time of the final hearing, had not yet identified adoptive caregivers for the

children does not outweigh the evidence that termination of Father's parental rights is in the children's best interest. *See In re E.A.F.*, 424 S.W.3d at 752 (upholding finding that termination of parental rights was in child's best interest even though child's current foster home was not potential adoptive placement).

Viewing the evidence in a neutral light, as we must, we conclude that the trial court reasonably could have formed a firm belief or conviction that termination of Father's parental rights was in the children's best interest. *See In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266. We hold that factually sufficient evidence supports the trial court's finding that termination of Father's parental rights was in the children's best interest.

We overrule Father's sole issue.

## Conclusion

We affirm the decrees of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Bland, and Lloyd.

26