**Reversed and Rendered and Memorandum Majority and Concurring Opinions filed December 20, 2018.**



In The

# 𝔉𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## NO. 14-17-00213-CV

### CARGOTEC CORPORATION, MACGREGOR USA, INC. AND CARGOTEC USA, INC., Appellants

### V.

### LOGAN INDUSTRIES, Appellee

**On Appeal from the 506th Judicial District Court
Waller County, Texas
Trial Court Cause No. 12-12-21726**

## M E M O R A N D U M   M A J O R I T Y   O P I N I O N

A jury found that appellant Cargotec Corporation breached the confidentiality provision of a letter of intent and committed fraud in connection with a failed proposal to purchase appellee Logan Industries, and awarded damages totaling $12.7 million. On appeal, Cargotec Corporation challenges the trial court's judgment on the jury verdict, contending that the evidence is legally and factually insufficient to support the jury's liability and damages findings, the award of damages for lost

profits and diminution of value are duplicative, the jury questions on damages and attorney's fees demonstrate reversible charge error, and the trial court committed reversible evidentiary error. Because we conclude that Logan presented legally insufficient evidence to support the damages findings, we reverse and render judgment for Cargotec.

## FACTUAL BACKGROUND

In 2010, Logan Industries[1] was an integrated design and manufacturing company specializing in the development, production, installation, repair, and servicing of heavy equipment for use by offshore energy companies in the Gulf Coast region. Logan was founded in 2002 by Chris Gridley. Logan's shareholders were Gridley, his wife Jenny, Shane Babich, and Dean Carey. Gridley, Babich, and Carey ran the business and employed about seventy-five people at Logan's headquarters in Hempstead.

Cargotec Corporation is a European company with international affiliates and subsidiaries including three sister brands: MacGregor, Kalmar, and Haib.[2] MacGregor manufactured and sold load handling equipment used in offshore oil exploration and production, including large subsea cranes. Cargotec became interested in acquiring Logan so that Cargotec could expand its ability to service and repair MacGregor's subsea cranes and other equipment in the Americas.

On December 7, 2010, Cargotec and Logan entered into a letter of intent (the LOI). The LOI memorialized Cargotec's nonbinding proposal to acquire Logan's assets for a price in the range of $18–25 million. This price range was subject to

---

[1] The record reflects that prior to the sale of its assets, Logan was variously known or referred to as Logan Industries, Logan Industries, Inc., or Logan Industries International, Inc.

[2] The parties agreed that for purposes of the trial, reference to "Cargotec" would encompass its affiliates and subsidiaries, including defendants MacGregor USA, Inc. and Cargotec USA, Inc.

change based upon a "valuation determined after appropriate due diligence has been conducted." The parties agreed to use reasonable efforts to negotiate and execute a definitive acquisition agreement on or before February 28, 2011.

The LOI included a binding confidentiality provision. Paragraph 9.3.2 of the confidentiality provision prohibited the parties from using Logan's "Confidential Information"[3] for any purpose other than evaluating the proposed acquisition, and it specifically prohibited the parties from "us[ing] Confidential Information to obtain a commercial, trading or other advantage." Additionally, paragraph 9.3.9 of the confidentiality provision specified that on the written request of one party, the other party was to "promptly to return or destroy, as directed, all materials containing Confidential Information and all copies, extracts or reproduction of it."

Cargotec chose Egil Lauvsland of Cargotec Norway to lead the due diligence team. Eight team members were assigned to evaluate discrete aspects of Logan's operation, including its business, human resources, and finances. Team members Pat Drake of Cargotec USA and another Cargotec Norway employee were tasked with reviewing and reporting on Logan's service capability.

Due diligence began in early February 2011. Cargotec team members made several trips to Logan's Hempstead, Texas facility and interviewed Logan's principals and employees. Cargotec also sought extensive information from Logan, including Logan's business plan, technical information, financial documents, customer lists, and equipment sales information. Babich became concerned about

---

[3] "Confidential Information" was defined to include the fact that the parties were discussing or negotiating the proposed acquisition of Logan and "all other information relating to [Logan], or to any customer or supplier of [Logan] which you or your advisers may disclose to us or our advisers, or any information relating to the parties which is disclosed by a party or by its advisers." Confidential information did not include information not known to Cargotec before it entered into the letter of intent and that did not otherwise become lawfully known to Cargotec from a source other than Logan.

the amount of confidential information Cargotec requested and argued with Gridley about it. Carey also complained, telling Gridley that "this is nuts." But Lauvsland and Cargotec's legal counsel on the due diligence team assured Gridley that Logan was protected by the confidentiality provision of the LOI.

On February 24, 2011, the Cargotec team produced an internal due diligence report on Logan titled "Project Lone Star." The fifty-nine-page report detailed all aspects of Logan's business. But Cargotec's due diligence was not yet completed, so the February deadline contemplated in the LOI was extended and Cargotec's due diligence activities continued into the spring and early summer.

In June 2011, Cargotec representatives met with Gridley, Babich, and Carey in Houston to negotiate an agreement to purchase Logan. Cargotec offered a purchase price of $26 million, a portion of which would be subject to an "earnout," meaning that Logan's shareholders would get a sum of money up front and the remainder would be distributed when certain goals and milestones were met. Logan's shareholders were opposed to the earnout that was proposed because it required Logan to provide warranty work for Cargotec cranes at cost. The shareholders believed that such an arrangement could negatively impact Logan's profitability and prevent Logan from meeting its goals, which would result in Cargotec paying less for Logan than what it was worth. The meeting ended without a deal. The next day, Gridley informed Cargotec that unless Cargotec was willing to submit an offer without an earnout by July 1, Logan would "consider this a dead issue and proceed with alternative plans."

On July 5, Gridley informed Lauvsland that it appeared that Project Lone Star had "come to a close" and requested that all information and documents provided to Cargotec from Logan or any of its employees be returned. Gridley also requested that a certificate of destruction be provided for any and all electronic versions of the

information, including "what was loaded onto Corporate servers." In September, Cargotec sent Logan written confirmation that it returned all printed material and documents made available to the due diligence team and that all team websites with electronic copies had been or would be closed down. Logan would later learn, however, that Cargotec had not returned or destroyed everything.

Despite the failed negotiations, Gridley understood from casual conversations with Lauvsland that Cargotec was still interested in Logan. On October 7, 2011, Gridley emailed Stefan Gleuel, one of the Cargotec executives who had made the initial decision to purchase Logan, to suggest that they "revisit" the acquisition or, alternatively, agree to make Logan an authorized manufacturing, sales, service, and support center for Cargotec. Gridley closed by requesting Gleuel's thoughts on the matter, "or a simple go to hell would work, too. . . [.]" Gleuel responded to Gridley's email two days later. Gleuel stated that the option of revisiting the potential acquisition of Logan was "still very interesting for us."

At around the same time, Cargotec had begun working on a project to pursue what it termed "organic growth" by opening its own offshore sales and service center in Houston to be headed by Pat Drake, who had participated in Cargotec's due diligence review of Logan. The project's staff also included at least three others from the due diligence team. Gleuel signaled his approval of the investment in the Houston service center on October 24, 2011, saying: "We do not wait for Logan. Go full speed ahead."

Cargotec did not inform Logan of its plans to open its own service center in Houston. Babich first became aware of the Houston service center's existence in May 2012 from a contact at Transocean—one of Logan's biggest customers—who told Babich that Drake had called on him offering services similar to those Logan provided. When Gridley heard that Cargotec was contacting Logan's customers, he

searched the internet and found an April 30, 2012 press release announcing "Cargotec opens Houston offshore service center" with Drake as its manager. Gridley feared that Cargotec was a new competitor that knew Logan's "roadmap" and might be able to take all of its customers. Babich was shocked when he saw the press release, because in his view the press release showed that Cargotec had started a business "that looked exactly like ours."

In the summer of 2012, Logan was approached by DGI, a Dutch company active in hydraulic technology in the oil and gas industry. DGI was interested in acquiring a company like Logan in the Houston area. DGI's chief executive officer at the time was Julius Ijzermans.

Gridley and Babich met with Ijzermans and told him that Cargotec had recently conducted a lengthy due diligence process for the potential purchase of Logan. Gridley and Babich also told Ijzermans that Cargotec had opened a competing business and contacted Logan's customers. Gridley and Babich were worried about this development because Cargotec had access to all of Logan's "IP," meaning its intellectual property. Ijzermans could see that Cargotec's lengthy due diligence period had a devastating effect on Logan and its business. DGI's own due diligence of Logan revealed that Cargotec's due diligence process had disrupted Logan's focus on its business and customers, Logan's profits were not where they should have been, Logan had lost staff, and there was stress within the management team and among the shareholders. DGI took all of these factors into account when determining a purchase price for Logan.

After a one-month due diligence period, DGI made a "take-it-or-leave-it" offer of $17.5 million cash for Logan's assets plus the assumption of its liabilities. Logan's shareholders accepted the offer and the parties signed a deal on October 1, 2012 for a total price of $22.5 million. Because Logan's shareholders had come to

believe that they had been wronged by Cargotec, the parties agreed that the shareholders would retain any legal claims they had against Cargotec.[4]

After DGI acquired Logan, the company did extremely well, and its profitability increased. Babich and Carey continued to work there. In contrast, Cargotec's Houston service center closed because it was unprofitable, and by the time of trial Drake no longer worked for Cargotec.

In December 2012, Logan filed this lawsuit against Cargotec and others. A jury trial was held over six days in late 2016. Logan asserted breach of contract and fraud claims against Cargotec, alleging that Cargotec violated the confidentiality provision of the letter of intent and improperly used Logan's confidential information to open and operate a competing business. Logan sought damages for lost profits and the diminished value of Logan's business.

The jury found that Cargotec failed to comply with the requirements of the LOI "with respect to the use of Confidential Information supplied to it" and committed fraud. In a single damages question predicated on an affirmative finding on either cause of action, the jury awarded Logan damages of $2.7 million for lost net profits and $10 million for loss of value. The jury also awarded Logan attorney's fees totaling $430,000.00.

The trial court rendered judgment on the jury's verdict on December 19, 2016. Cargotec filed several post-judgment motions, all of which were denied by written orders. This appeal followed.

---

[4] DGI's purchase of Logan's assets included the company name, so Gridley, Babich, and Carey had to come up with a new name for their own company. Gridley explained that he thought of the name "Three Stooges Amalgamated" because he and his son used to watch Three Stooges movies together, and the name also fit because there were three shareholders. In the trial court, the three shareholders were sometimes referred to as the Three Stooges, and the pre- and post-asset sale entities were referred to as "Old Logan" and "New Logan" respectively. For consistency, we will refer to the pre-acquisition plaintiff as Logan.

**ANALYSIS OF THE ISSUES**

On appeal, Cargotec challenges several aspects of the trial court's judgment. Because we conclude that Cargotec's complaint that the evidence is legally insufficient to support the jury's award of damages for lost profits and diminished value is dispositive, we do not reach Cargotec's other issues.

**I.     The Sufficiency of the Evidence Supporting the Damages Awards for Lost Profits and Diminished Value**

In its first issue, Cargotec argues that the evidence is legally insufficient to support the jury's award of damages for lost profits and diminished value caused by Cargotec for two main reasons: (1) there is no evidence that Logan lost any business because of Cargotec's conduct; and (2) the damages calculations by Logan's expert are speculative and unfounded and are no evidence that Cargotec caused Logan to sustain lost profits or lost value.

**A.     Standards of Review and Applicable Law**

When reviewing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the jury's findings and assume that the jury resolved all conflicts in accordance with its judgment. *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005). We credit favorable evidence if reasonable jurors could, and we disregard contrary evidence unless reasonable jurors could not. *Id.* at 827. The ultimate test is whether the evidence at trial would enable reasonable and fair-minded people to reach the answer under review. *Id.* A no-evidence review encompasses the entire record, including contrary evidence tending to show that an expert opinion is incompetent or unreliable. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). The factfinder is the sole judge of the witnesses' testimony as well as the weight to be given to their testimony. *City of Keller*, 168 S.W.3d at 819.

Lost profits are damages for the loss of net income to a business measured by reasonable certainty. *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002). Broadly speaking, lost profits reflect income from lost business activity, less expenses that would have been attributable to that activity. *Hunter Bldgs. & Mfg., L.P. v. MBI Global, L.L.C.*, 436 S.W.3d 9, 18 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although lost profits need not be susceptible to exact calculation, the injured party must do more than show that it suffered some lost profits. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). The amount of the loss must be shown by competent evidence with reasonable certainty. *Id*. The requirement of reasonable certainty also applies when lost profits are used to prove the market value of property for which recovery is sought. *See Phillips v. Carlton Energy Grp.*, 475 S.W.3d 265, 280 (Tex. 2015).

What constitutes reasonably certain evidence of lost profits is a fact intensive determination. *Heine*, 835 S.W.2d at 84. At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *Id*. Lost profits are not demonstrated with reasonable certainty by a plaintiff's "bare assertion that a contract was lost" or by evidence that is "largely speculative or a mere hope for success." *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 860 (Tex. 2017). Even if legally sufficient evidence might otherwise establish a breach of contract or tort permitting an award of lost profits, "profits not susceptible of being established by proof to that degree of certainty which the law demands cannot be recovered as damages." *Id*. (internal quotations omitted).

## B.     Evidence of Lost Business Caused by Cargotec

Cargotec first argues that the evidence is legally insufficient to support the damages awarded because Gridley, Babich, and Carey presented no evidence that

Logan lost any business as a result of Cargotec's alleged use of confidential information, and Ijzermans's testimony merely repeated Gridley, Babich, and Carey's speculation about Cargotec. Cargotec primarily relies on *Horizon* for the proposition that "Texas courts require that a plaintiff seeking damages based on lost profits from future business opportunities adduce evidence establishing that prospective customers would have done business with the plaintiff absent the defendant's misconduct." *See Horizon*, 520 S.W.3d at 861.

At trial, Gridley testified that Logan's business had no growth during 2011 and 2012 in part because Drake was calling on Logan's top customers, including Transocean and Seadrill, during and after Cargotec's due diligence. Gridley complained that even if Drake did not get the business, customer concerns that Logan might go out of business or a desire not to get in the middle of an argument between Cargotec and Logan could "poison the well" and make it difficult to get those customers back. Gridley also complained that Cargotec's "overly invasive" due diligence process led to employee morale issues and rumors about the company's future within the industry. But Gridley did not know of any business that Logan lost to Cargotec, and he admitted that he had no firsthand knowledge that Cargotec used Logan's technical information. Gridley also acknowledged that Cargotec's Houston service center did not work on the kind of heavy equipment that Logan did.

Carey testified that Logan's business was unique because it not only repaired the equipment of other manufacturers, it also manufactured equipment for its customers, all in one place. Carey stated that there were only about six companies worldwide capable of doing the same thing, and none were in the Houston area. According to Carey, Logan's business had been on an upward trend before Cargotec's due diligence process began, but during and after that process Logan lost

10

business and its growth was flat. On cross-examination, Carey admitted that Logan's business plan identified at least three competitors in the Houston area. He also admitted that he did not know for a fact that Cargotec misused any of Logan's drawings, information, or designs, and he did not know if Logan lost any business to Cargotec. Nor could he recall ever losing a bid to Cargotec. In fact, Carey did not even know what kind of work Cargotec did at its Houston service center.

Babich testified that in 2010, Logan's three largest customers were Transocean, Seadrill, and Diamond Offshore. According to Babich, Logan lost business from each of these customers over the next two years, during and after Cargotec's due diligence when it opened its own Houston service center. Babich claimed that Cargotec harmed Logan by calling on Logan's customers and trying to acquire the kind of business Logan was doing. On cross-examination, however, Babich admitted that Logan's own documentation of its sales revenues showed that revenue from Transocean actually increased each year from 2009 through 2011. Further, Babich admitted that the reason Logan lost Seadrill business during Cargotec's due diligence was that Logan's employees talked to a Seadrill representative about the possible acquisition of Logan by Cargotec, which caused Seadrill to move its business to another vendor. Babich offered no specific reason why Logan allegedly lost business from Diamond Offshore. Nor did Babich know whether Logan lost any customer to Cargotec's Houston service center.

Neither Gridley, Carey, nor Babich presented any evidence that Logan lost specific projects, contracts, or revenues from customers as a result of Cargotec's misuse of Logan's confidential information. *See Horizon*, 520 S.W.3d at 861; *Heine*, 835 S.W.2d at 85. Without such evidence, the bare assertions from Gridley, Carey, and Babich that Logan lost business during and after Cargotec's due diligence process are merely speculation that is legally insufficient to establish the fact of lost

11

profits or lost value damages with reasonable certainty. *See Horizon*, 520 S.W.3d at 861–62; *Phillips*, 475 S.W.3d at 280; *Heine*, 835 S.W.2d at 85.

Similarly, Cargotec argues that the testimony of Ijzermans, the former CEO of DGI, adds nothing to the generalized complaints of Logan's shareholders. Cargotec maintains that Ijzermans testified that he did not independently verify what the shareholders told him about Cargotec; instead, Ijzermans merely observed that Logan's shareholders were worried and so he factored their concerns into the price DGI offered.

Logan responds that Cargotec's characterization of Ijzermans's testimony is inaccurate. Logan argues that Ijzermans testified that he was an experienced businessman who had purchased many companies, and that based on his experience, he calculated a lower price for Logan "because Cargotec had Logan's information and was using it to steal customers." Logan also claims that "Cargotec caused DGI to make a lower offer" for Logan because, as Ijzermans explained, "in our own calculations, we estimated that—that [Logan], just from the normal linear development and looking at all the books and stuff, that if it didn't have the disruption that had taken place . . . over the last 18 months, we would easily have paid $10 million extra."

The testimony Logan relies on as evidence that Cargotec was using Logan's information to "steal customers" is based on the following hypothetical question posed by Logan's counsel: "If there are competitors who are attempting to steal away the customers of a company such as Logan, can that affect profitability?" In response, Ijzermans answered, "Absolutely," and he also agreed that such a situation could affect the calculation of the company's asset value.

But Ijzermans did not testify that Cargotec was stealing Logan's customers as Logan asserts. To the contrary, on cross-examination Ijzermans confirmed that he

12

did not independently verify what Logan's shareholders told him about Cargotec:

> Q. [Cargotec's counsel:] Now, did they tell you that Cargotec had opened up a competing business?
>
> A. [Ijzermans:] Yes.
>
> Q. Did you check that competing business out?
>
> A. No.
>
> Q. Okay. You just took their word for it?
>
> A. Yep.
>
> Q. Okay. Do you know for a fact whether — do you know one way or the other what that competing business was —
>
> A. No.
>
> Q. — what services it was —
>
> A. No.
>
> Q. — providing?
>
> A. No. I was informed that Cargotec set up a competing business. I was informed that they had approached Logan customers, and I was informed that they were in possession of all Logan's IP. That was my information of — on that subject.

Significantly, Ijzermans further testified that Logan did not inform him that Cargotec was using Logan's confidential information:

> Q. Now, you were told that — by the people at Logan, during the acquisition, that they believed that Cargotec had gone and used their confidential information. Is that what you testified?
>
> A. They told me that — what they told me was that, first of all, Cargotec possesses that information; and, secondly, that they had approached some key customers. That's what they told me.
>
> Q. Okay. They didn't tell you that it was used?
>
> A. That's what they did not tell me.[5]

---

[5] Additionally, the Asset Purchase Agreement by and among Logan, Logan's shareholders, and DGI, reflects that Logan and its shareholders represented that to their knowledge, no third

Thus, contrary to Logan's assertions, Ijzermans did not testify that DGI offered less money for Logan because Cargotec was using Logan's confidential information to steal its customers. Ijzermans's testimony reflects only that DGI offered less because Logan's shareholders had told him about the extent of Cargotec's due diligence and its subsequent actions, the lengthy and disruptive due diligence process, and the entry of a Cargotec affiliate as a new competitor—none of which is evidence that Logan was damaged as a result of Cargotec's misuse of Logan's confidential information. *See Horizon*, 520 S.W.3d at 861; *Heine*, 835 S.W.2d at 85; *Hunter Bldgs.*, 436 S.W.3d at 20–21 (explaining that a claim for lost profits requires evidence that damages were caused by the actionable conduct alleged).[6]

Logan also argues that Cargotec ignores direct and circumstantial evidence that Drake solicited and obtained business from Logan's customers. Logan asserts that there is "substantial documentary evidence" that Drake "misrepresented the facts when he testified that Cargotec did not perform work for Transocean, Seadrill, or Diamond." But the testimony Logan cites does not show that Drake made such a broad statement. At trial, Drake was asked whether a Cargotec accounting summary of invoiced orders for the Houston service center for 2012 through 2014 included

---

party was "infringing, violating misusing or misappropriating" any of the intellectual property included in the sale.

[6] Indeed, as discussed above, Babich explained that Seadrill moved its business elsewhere in part because Logan's own employees told Seadrill's representative about the potential acquisition. Consistent with Ijzermans's testimony, Babich also blamed the loss of most of Seadrill's work on the distraction caused by Cargotec's requests for information during the due diligence process. Carey similarly testified that Logan lost business during the due diligence process because they were "not focused" on their business due to everything they were having to do for Cargotec, and Gridley complained that Logan's revenue did not grow in 2011 "because Cargotec happened." Logan's complaints about the due diligence process—which Logan contractually agreed to permit—are not evidence that Logan lost profits because of Cargotec's alleged misuse of Logan's confidential information.

14

Transocean, Seadrill, or Diamond. Drake testified that it did not.

To counter Drake's testimony on appeal, Logan refers to six exhibits consisting of Cargotec's monthly reports for services summarizing the activities and revenues of various Cargotec affiliates, including the Houston service center. The exhibits appear to reflect that between March and July of 2012, the Houston service center performed or bid on work for Transocean, Seadrill, and Diamond, as well as some other Logan customers.[7] But even if the jury found Drake's testimony generally not credible, Logan does not direct us to any evidence demonstrating that the type of work reflected on those reports for those customers was work Logan could or would have done, that Cargotec could not have performed the work without using Logan's confidential information, or that Logan would have obtained the work but for Cargotec's actions.

To illustrate Logan's claim that Drake's conduct caused Logan to lose business, Logan uses a Cargotec exhibit to create a table that purports to summarize Logan's total revenues from Transocean, Seadrill, and Diamond for the years 2007 and 2009 through 2012. As an initial matter, Logan fails to disclose that the 2012 revenues do not include the last three months of the year, so the true totals for that year are not reflected. Even so, the chart reflects that Logan's revenues from Transocean increased in 2011 before returning to roughly the same amount as 2010, and revenues from both Diamond and Seadrill peaked in 2010 but were still significantly higher in 2011 and 2012 than in 2007 and 2009.[8] But even if Logan

---

[7] Drake acknowledged that he called on companies including Transocean, Seadrill, and Diamond, both before and after the Houston service center opened, but he denied using Logan's information to call on or solicit customers. Drake also testified that he told Transocean and other customers that the service center could rebuild hydraulic cylinders and riser tensioners (specialized work that Logan did) if modifications were made to its equipment, but ultimately that type of work was never done because the equipment was not modified.

[8] Logan also asserts that total sales from all customers declined significantly in 2011 and

15

experienced a decline in business during and after its involvement with Cargotec, that fact alone is not evidence that its losses were caused by Cargotec's improper use of Logan's confidential information.

Moreover, to the extent that Logan contends it lost business because Drake was "courting Logan customers and secretly preparing to compete with Logan" during and after the due diligence period, Logan points to no evidence that its customers or their contact information was confidential or previously unknown to Cargotec. To the contrary, Drake testified without contradiction that he had worked in the industry since the 1970s and had called on customers like Transocean and its predecessors for many years. Gridley acknowledged that Transocean, Seadrill, and Diamond were all large, well-known companies, and Ijzermans testified that it was common for service providers in the industry to call on each other's customers and compete for their business.

On this record, we conclude that the testimony and evidence is legally insufficient to demonstrate that Logan lost business as a result of Cargotec's use of Logan's confidential information. *See Horizon*, 520 S.W.3d at 861; *Heine*, 835 S.W.2d at 85; *Hunter*, 436 S.W.3d 18; *see also Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 634–35 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (stating that evidence was legally insufficient to support some ascertainable amount of lost profits when appellee "presented no evidence to show that it lost any particular sales to [appellant] due to [appellant's] possession of [appellee's] customer list or to show the profit margin associated with any particular customer or any particular product").

2012 but does not offer any citation to the record to support this statement.

16

### C. Hancock's Testimony on Damages

Cargotec next raises numerous challenges to the legal and factual sufficiency of the testimony of Robert Hancock, Logan's business valuation expert, in support of Logan's damages. Because Hancock's damages calculations are predicated on speculative and unsupported gross profit goals contained in Logan's business plan, we conclude that Hancock's testimony is unreliable and no evidence of damages, and we do not reach Cargotec's other complaints about Hancock's testimony.[9]

#### 1. Hancock's Opinions

Hancock is a certified public accountant accredited in business valuation. Cargotec does not dispute Hancock's qualifications.[10] Hancock testified that he was retained to consider Logan's claims of alleged wrongdoing by Cargotec, to look primarily at the 2011 and 2012 time periods, and to make a financial assessment to determine what had happened. Although Hancock prepared a report of his assessment, it was not admitted into evidence and was used only as a demonstrative exhibit to illustrate how he reached his opinions concerning Logan's lost profits and diminished value resulting from Cargotec's alleged wrongdoing. Only one page of the report—a chart of Hancock's calculation of lost profits—was admitted into

---

[9] Cargotec's complaints fall into categories containing multiple subparts: (1) Hancock's damages calculations are unreliable and no evidence of damages because they rest on speculative and unsupported gross profit goals contained in Logan's business plan and do not calculate lost net profits as Texas law requires; (2) Hancock's diminished value opinion is legally and factually insufficient because he did not compare like pre-injury and post-injury values; he used a hypothetical stock value rather than a market value; and his lost value measure duplicates his lost profit measure; and (3) Hancock's testimony is no evidence of causation because he did not link Cargotec's actions to either the damages calculated or any misuse of Logan's confidential information, and his causation opinion is otherwise speculative.

[10] Cargotec objected to the reliability of Hancock's testimony both before trial at a *Daubert* hearing and again when offered at trial. Cargotec also renewed its objections to Hancock's testimony as well as the sufficiency of the evidence concerning damages and causation in post-trial motions.

evidence.

Hancock opined that over the period from January 1, 2011 (close to the date the LOI was executed) and September 30, 2012 (the day before Logan's assets were sold to DGI), Logan suffered lost profits of $10,713,000.00. Hancock further opined that as of September 30, 2012, Cargotec's alleged actions diminished Logan's fair market value by $11,687,000.00. To determine diminished value, Hancock estimated Logan's fair market value on January 1, 2011, to be $31,120,000.00. He then calculated that on September 30, 2012, Logan's value should have been $34,187,000.00, but for the "loss of profits" by Logan.

### 2. *Logan's Business Plan*

Hancock acknowledged that he relied on Logan's business plan for both his lost profits and diminished value opinions. The business plan was prepared by Gridley in late 2010 after Logan began to attract interest from potential purchasers. Gridley testified that before Cargotec became interested in Logan, Huisman-Intrepid Services, LLC, a Dutch company, had expressed interest in purchasing the company. By the time Cargotec contacted Gridley, Logan's shareholders believed that Logan was worth somewhere in the $30 million range. Gridley prepared the business plan quickly at Cargotec's request. According to Gridley, Cargotec had "found out Huisman was interested in us . . . and wanted to hurry up and lock us up."

Logan's business plan included a one-page sales forecast that projected steadily increasing gross profits (identified as "total income") and operating profits from five general categories of sales and services for each year from 2010 through 2015. Each year's operating profit (before taxes and depreciation) was determined by subtracting the total cost of sales and the total cost of overhead and administration from the projected total income for each year. The sales forecast began with an estimated 2010 total income of $20,400,000.00 and ended with a 2015 total income

18

of $60,645,000.00. Gridley did not explain the basis for the numbers that made up the sales forecast's projections.

### 3. Hancock's Reliance on Logan's Business Plan

Hancock testified that it is reasonable to use management projections in reaching opinions concerning lost profits and lost business value if the projections can be substantiated. Hancock explained that "[y]ou just don't blindly take them and say [snaps fingers] 'Here you are.' That's just math. There's a thought process that goes behind that, the math." Hancock then proceeded to describe the voluminous information he reviewed and the time he spent in reaching his ultimate opinions.[11] But Hancock never explained what, if anything, he did to substantiate the business plan's projections.

Hancock admitted that he did not "go behind the numbers" and perform an independent calculation to determine the basis for the projected total revenues and cost of sales that were reflected in the business plan because "the calculation had already been made." Hancock did not attempt to determine what customers would provide Logan's revenues, identify the type of work that would supply Logan's revenues, or determine the costs that would likely be incurred. For example, Logan's projected growth in 2011 included two categories of additional income totaling $4 million, but Hancock did not determine what customers were anticipated to provide that income in either category. Likewise, he did not try to attribute the alleged lost profits to any particular customer or source of revenue.

---

[11] Hancock explained that he used the same methodologies to reach his opinions as he uses outside the litigation context and that he undertook a standard evaluation of Logan's lost profits and lost business value. Hancock's evaluation included reviewing Logan's business plan, tax returns, financial statements, Ijzermans's deposition, and other documents; conducting economic and industry research; making two visits to Logan's facility; and interviewing Gridley, Babich, and Carey.

The business plan reflected that for 2010 Logan anticipated a total revenue of $20,400,000.00 and an operating profit of $5,347,000.00. Although Gridley wrote the business plan in late 2010, at a time when he should have been able to reasonably forecast the anticipated profits for that year, Logan's actual gross profit in 2010 was $7,669,750.00, actual net income was $1,519,848.00, and operating income was just $875,577.00. According to Hancock, the business plan also anticipated that total revenue and operating profit in 2011 would increase by roughly 40% over the anticipated 2010 projections, a goal that appears unreasonably optimistic considering Logan's actual 2010 performance. Additionally, the business plan's projections assumed that Logan's facility would be expanded. But the expansion did not occur, and Hancock conceded that one of the business plan's underlying assumptions was not fulfilled. Hancock also conceded that historically Logan had never had profits of the magnitude the business plan projected. Nevertheless, Hancock accepted Logan's assumptions of future revenues as the basis for his damages opinions.

Hancock admitted that he did not make any independent projections of Logan's revenues or profits, but he denied that he merely accepted them at face value. Hancock testified that he adjusted the business plan's projections downward by applying a discount factor, which he termed a "financial haircut." Hancock explained that the discount factor accounted for the time value of money and various factors relevant to a business such as Logan's. Hancock admitted, however, that no amount of adjustment or "haircut" could make an unsubstantiated, overly optimistic business plan reliable.

Courts have rejected damages opinions predicated on assumptions made in internal projections or business plans not shown to be reasonable. *See, e.g., Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc*, 131 S.W.3d 203, 208–09 (Tex.

20

App.—Fort Worth 2004, pet. denied) (holding that expert's testimony concerning two damages models premised on lost profits projections that were based on "one record year and the unsubstantiated projections received from appellee's owner" for a nearly six-year period was no evidence of lost profits); *Glattly*, 332 S.W.3d at 634–35 (holding that no evidence supported award of lost profits damages when expert's opinion was based on plaintiff's unsupported sales and profit-margin assumptions, expert did no independent work to verify the reasonableness or reliability of the assumptions, and no other evidence was offered to support the assumptions); *see also Robertson v. Morin*, No. 03-08-00527-CV, 2009 WL 2902720, *6 (Tex. App.—Austin Aug. 27, 2009, no pet.) (mem. op.) (holding that expert's financing and lost profits opinions based on projections in business plan prepared by plaintiff to recruit investors were unreliable when expert failed to explain why it was reasonable to rely on the assumptions). Similarly, Logan directs us to no evidence demonstrating that the gross profits assumptions in Logan's business plan were reasonable.

Logan contends, however, that Hancock's opinions should be accepted because they are consistent with independent valuations and financial analyses prepared by Howard Frazier Barker Elliott, Inc. (HFBE) for Huisman, and Pricewaterhouse Coopers (PwC) for Cargotec. According to Logan, Hancock employed the same methodology as these valuation firms and reached similar results. Therefore, Logan maintains, Cargotec's argument that Hancock's opinions are no evidence is unfounded. As this court has explained, companies are free to create speculative, optimistic, and conjectural projections and to rely on them in making business decisions. *Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*, 207 S.W.3d 801, 822–23 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). However, "the mere existence of similar projections created by a company other than the plaintiff, even by a defendant in the breach-of-contract action, does not

obviate the need for courts to apply the 'reasonable certainty' test, nor does it indicate conformity with this legal standard." *Id*. at 823 (citing *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 280 (Tex. 1994)).

At trial, Hancock testified that among the materials he reviewed in preparing his opinions was a business evaluation of Logan prepared by HFBE. Like Hancock, HFBE based its valuation of Logan on Gridley's projections contained in Logan's business plan. According to Hancock, based on the income approach to valuation, Logan was worth $31.1 million prior to Cargotec's due diligence, which he testified was consistent with Huisman's valuation. Hancock also testified that his valuation using the income approach was corroborated by his valuation using the market approach. But Hancock provided no information or analysis explaining the basis of HFBE's evaluations other than to state that HFBE used the same management projections and employed the same methodologies that he used.

Hancock did not testify at trial about the evaluation PwC prepared for Cargotec or make any comparison of his conclusions to those of PwC, but he did compare his valuation of Logan to Cargotec's discounted cash flow analysis of Logan.[12] Hancock opined that by applying the "complete income approach" to Cargotec's numbers, he valued Logan's business at $33.8 million as of January 2011.[13] Hancock stated that subtracting the amount that Logan sold for in October 2012 from $33.8 million reflected "roughly" a $10 million reduction in Logan's value, consistent with his calculation of Logan's lost value. On cross-examination,

---

[12] Thomas Wichmann, an employee of a Cargotec affiliate who participated in Cargotec's due diligence, testified that PwC's evaluation "confirmed all assumptions" of the due diligence.

[13] Hancock explained that his valuation under the income approach was based on calculating its earnings capacity into perpetuity, which is the standard methodology. In contrast, Cargotec's assessment was limited to ten years into the future, so he "made that adjustment to the Cargotec valuation." Hancock explained that adding the extra years added value.

22

however, Hancock acknowledged that Cargotec's "best case scenario" based on its discounted cash flow analysis was $24.9 million, an amount less than the $26 million Cargotec offered to acquire Logan in June 2011.

Accepting for purposes of argument that the evaluations of HFBE and PwC were consistent with Hancock's opinions, Logan points to no evidence presented at trial that either evaluation substantiates Gridley's gross profits projections in Logan's business plan, and we have found none. The mere fact that the evaluations may be roughly consistent with Hancock's opinions, without more, does not demonstrate that the assumptions in Logan's business plan are reasonable. *See id.* at 822–23.

Hancock testified that he reviewed "the standard financial documents that CPAs and business evaluators use" to determine Logan's business value and lost profits, and he asserted that he "did not need to review anything more" to reach his opinions. As our sister court has observed, however, "a party seeking to prove lost profits must provide a model showing how the amount of lost profits can be determined, support that model with facts and assumptions, and demonstrate how the assumptions in the model are reasonable." *Holmes v. Jetall Cos.*, No. 01-15-00326-CV, 2016 WL 3662645, at *4 (Tex. App.—Houston [1st Dist.] July 7, 2016, pet. denied) (mem. op. on reh'g). Bare assertions that that the expert took the necessary considerations into account are not sufficient to carry the burden of proof. *Id*. at *6.

In summary, the evidence supporting damages in this case consists of: (1) Logan's bare assertions that it lost business, unsupported by any evidence that it lost specific customers or business that it would have obtained but for Cargotec's wrongdoing; and (2) Hancock's lost profits and diminished value damages, both of which are predicated on Logan's bare assumptions of projected revenues and profits

in its business plan, unsupported by objective facts, figures, or data establishing that these assumptions are objectively reasonable. Thus, even if some evidence supports a finding that Cargotec breached the LOI or committed a tort by misusing Logan's confidential information, Logan cannot recover lost profits damages or lost value damages. *See Horizon*, 520 S.W.3d at 860, 861–62; *Phillips*, 479 S.W.3d at 280; *Heine*, 835 S.W.2d at 84; *Hunter*, 436 S.W.3d at 18; *Glattly*, 332 S.W.3d at 632–35; *Atlas Copco Tools*, 131 S.W.3d at 208–09. Because our holding disposes of the appeal, we sustain Cargotec's first issue on the basis that the evidence is legally insufficient to establish causation and damages, reverse and render judgment in Cargotec's favor, and do not reach Cargotec's remaining issues.

## CONCLUSION

We hold that the evidence is legally insufficient to show any amount of reasonably certain lost profits or business value caused by Cargotec's misuse of Logan's confidential information, and we reverse and render a take-nothing judgment for Cargotec on that basis.


/s/     Ken Wise
         Justice


Panel consists of Justices Jamison, Wise, and Jewell (Jamison, J., concurring).